42 N.J. Super. 436 (1956)
127 A.2d 27
ANTHONY PALUMBO, EXECUTOR UNDER THE LAST WILL AND TESTAMENT OF SAM Z. SBARAGLIA, DECEASED, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT.
v.
MICHAEL B. COLLITO, EXECUTOR UNDER THE LAST WILL AND TESTAMENT OF THOMAS A. COLLITO, DECEASED, SAMUEL COLLITO, JR., MICHAEL B. COLLITO, ANNA COLLITO AND LOUIS COLLITO, DOING BUSINESS AS VICTOR FLUSH VALVE CO., DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 1956.
Decided November 14, 1956.
*440 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Ralph G. Mesce argued the cause for appellants and cross-respondents.
Mr. Daniel Leff argued the cause for respondent and cross-appellant.
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
After this action was tried in the Essex County Court, the pleadings were amended to designate the parties defendant as "Samuel Collito, Jr., Michael B. Collito, and Michael B. Collito, trustee for Anna Collito and Louis Collito, doing business as Victor Flush Valve Co., and Michael B. Collito, executor under the last will and testament of Thomas A. Collito, deceased." The County Court entered judgment in favor of plaintiff against Samuel Collito, Jr., Michael B. Collito, and Michael B. Collito, trustee for Anna Collito and Louis Collito, doing business as Victor Flush Valve Co.; and dismissed the second *441 count of the amended complaint against Michael B. Collito, executor of the estate of Thomas A. Collito, upon the ground that plaintiff had failed to file a claim with the executor. Defendants appeal from the judgment in plaintiff's favor and from the County Court order refusing to set aside the verdict and grant a new trial. Plaintiff cross-appeals from the dismissal of the second count.

I.
Samuel B. Sbaraglio (erroneously denoted as Sbaraglia in the pleadings), plaintiff's decedent, was a building contractor. On December 15, 1952 he submitted to Thomas A. Collito two proposals for construction work in accordance with plans and specifications prepared by Joseph and James G. Centanni, architects. In the first he proposed to build for Victor Flush Valve Co. on its lands in Newark, N.J., a one-story factory building for $50,850; and in the second to build for Sylvester & Co. on its lands in South Orange, N.J., a residence for $46,500. Collito was then president of Sylvester & Co., a wholly-owned corporate subsidiary of the Victor partnership, but held no position in Victor. Sbaraglio's first proposal of $50,850 was increased to $66,900 in an estimate submitted on January 8, 1953, after the plans for the Victor building were amended to include a one-story shed. Simultaneously, he submitted to Sylvester an estimate for a completed basement at the South Orange premises for $10,750.
A day or so prior to January 14, 1953, Sbaraglio, Collito and James G. Centanni, the architect, conferred with Carl Abruzzese, Collito's attorney, at his law office to arrange terms for the construction of the factory and shed in accordance with the latest Sbaraglio proposal, and also to compile a schedule of payments. Centanni and Abruzzese made four pages of notes setting out the terms agreed upon. This was done in the presence of all the conferees. Centanni testified that Sbaraglio instructed him with reference to the preparation of the notes, and they incorporated everything he said. Abruzzese testified the memorandum was used by *442 all four conferees, and they agreed upon the total price and manner of payment set forth therein. Both Abruzzese and Centanni were permitted to testify to the details of the agreed schedule of payments, totalling $66,900, after refreshing their recollection from the notes. The court, however, refused to admit the memorandum in evidence.
On January 14, 1953 Sbaraglio and Thomas A. Collito entered into a contract for the construction of the factory and shed at a price of $77,650, $10,750 more than the previous figure. At the same time Sbaraglio handed Collito a formal proposal addressed to Sylvester & Co. to erect a complete basement for the South Orange residence, together with a temporary road, rough grading, 240-foot stone retaining wall, drain trench, and first floor beams and rough floor, for $10,750. At the foot of this proposal appears a receipt, "Paid for the above work," signed by Sbaraglio. Just when he signed this receipt is not shown.
The testimony was that immediately preceding the signing of the factory contract Sbaraglio and Collito had stepped out of the attorney's office and privately conferred in the corridor for about ten minutes. That contract, incidentally, followed the same schedule of payments as was testified to by Abruzzese and Centanni from their notes, except that $2,000 was added to each of the first five payments and $750 to the sixth and final payment.
Defendants claim that the factory price was inflated by $10,750, and that Sbaraglio's receipt shows this sum was to pay for the work he was to do at South Orange. They also assert that Sbaraglio never apprised them of all that had preceded the execution of the factory contract.
Sbaraglio began work on the factory building and South Orange basement. Up to June 12, 1953 Thomas A. Collito paid him $35,100 on account of the factory contract, representing slightly more than the first three payments under the schedule. However, nothing was paid Sbaraglio on account of the South Orange work. Collito died June 15, 1953 and his brother, defendant Dr. Michael B. Collito, was appointed his executor. Dr. Collito was and is a partner *443 in the Victor company, and he succeeded his brother as president of Sylvester & Co. When Thomas died construction on both jobs came to a standstill.
On September 9, 1953 Dr. Collito and Sbaraglio entered into a contract, prepared by Abruzzese, whereby Sbaraglio agreed to "erect and finish" the South Orange residence in accordance with the Centannis' revised drawings and specifications and under their direction, for $46,200. The schedule of payments provided that the builder was to get $7,000 "when foundation and basement walls are up and first floor beams in place and entire first floor beams have sub flooring, and when all exterior wood walls are sheathed and wood rafters are sheathed." The contract contained an allowance of $1,200 for the stone retaining wall if the owners decided not to have it erected. (It was, in fact, never erected.)
Work at the factory and South Orange residence was again resumed. During the ensuing year Sbaraglio received payments totalling $31,326.54 from Sylvester & Co. on account of the residence, and $34,949.36 from the Victor partnership for the factory in addition to the $35,100 previously paid by the decedent Collito. (It should here be noted that $9,990.70 in extras were added to the $77,650 contract, making a total of $87,640.70. Payments on account by decedent and Victor totalled $70,049.36, leaving a balance of $17,591.34.)
In June 1954 Sbaraglio left for a three-month vacation in Europe. Dr. Collito claims that while Sbaraglio was abroad he discovered an envelope containing the proposals and estimates of December 15, 1952 and January 8, 1953 in his deceased brother Thomas' clothes. He alleges that shortly thereafter he also discovered the receipted proposal of January 8, 1953 for a complete basement at the South Orange premises. Dr. Collito testified that he immediately got in touch with his accountant, Rothfeder, and arranged to confront Sbaraglio as soon as he came back from Europe. On September 30, 1954, the day after Sbaraglio's return, the parties met at the new factory building, with Sbaraglio, Dr. Collito, Samuel Collito, Rothfeder, Abruzzese and Centanni *444 present. The only information we have about what happened on that occasion comes from Rothfeder, who alleges that Dr. Collito and Sbaraglio conferred privately in an adjoining room; that he later joined the two and asked Sbaraglio what he was going to do about the receipt, and that Sbaraglio then said he was going to give Dr. Collito credit for it. Neither Centanni nor Abruzzese, both of whom testified during the trial, were examined by defendants' counsel with regard to this meeting. Dr. Collito said that a good deal of the talk was social, and Centanni, in the course of testifying with regard to certain extras performed, indicated that this subject came up at the September 30 conference when Sbaraglio was asked about a $5,000 extra charge "to fix these [South Orange] foundation walls," which Victor eventually agreed to pay. Sbaraglio died the day following the conference and plaintiff Palumbo, his son-in-law, was appointed executor of his estate.
It is evident from the record that the Collitos were closely bound in family ties and business affairs. When the Victor partnership found itself financially unable to undertake the erection of the new factory building, decedent Thomas A. Collito undertook to built it at no profit to himself. As noted, he made the first three payments under the contract. Although the Victor company in its answer denied that it assumed the factory contract, that defense had to be abandoned in the light of the testimony that it did assume and did make payments thereunder after Thomas died. It may also be mentioned here that it was Thomas who invested money in the Victor company for his sister, defendant Anna Collito, and his nephew and adopted son, defendant Louis Collito, by way of gift and declaration of trust whereunder he and his brother Dr. Collito were trustees for Anna and Louis.

II.
It should be specially noted that at the pretrial conference the parties agreed that plaintiff would institute a separate action against Sylvester & Co. for the balance due *445 under the contract to construct the South Orange residence. Upon the institution of such suit, the counterclaim originally filed in the present action to recover certain sums allegedly owing by plaintiff's decedent was to be dismissed, reserving to defendants and Sylvester & Co. the right to plead the same in the action about to be instituted. Plaintiff thereafter instituted suit against Sylvester & Co. in the Law Division of the County Court. An order was then entered severing defendants' counterclaim in this case and joining it for trial in the new action which plaintiff had brought.

III.
We deal first with plaintiff's cross-appeal from the dismissal of the second count demanding judgment against Michael B. Collito as executor of Thomas A. Collito. By way of defense to this count Dr. Collito had pleaded that plaintiff had failed to serve and file with him a proof of claim under oath. Nowhere in the pretrial order is there any reference to this failure to file a claim as a defense to the action.
The precise question raised on the cross-appeal has apparently never been determined by an appellate tribunal of this State.
It has been said that in the absence of statutes to the contrary, the presentation of a claim to the executor or administrator is not a condition precedent to the commencement of an action against him upon such a claim. 21 Am. Jur., Executors and Administrators, § 342, p. 576; 34 C.J.S., Executors and Administrators, § 700c, p. 674; Annotation, 34 A.L.R. 362, 363 (1925).
The only section of Chapter 12 of Title 3A, dealing with "Actions by or against Fiduciaries," which would appear to have any relevancy in this case is N.J.S. 3A:12-5:
"To enable executors or administrators to examine into the condition of the estate and to ascertain the amount and value thereof and the debts to be paid therefrom, no action, except for funeral expenses, shall be brought or maintained against executors or administrators *446 within 6 months after letters testamentary or of administration have been granted, as the case may be, unless by special leave of the court wherein the action is brought; and, if such leave is given, no execution shall issue within the said period of 6 months."
This statute is clearly silent about the need for filing claims prior to the institution of suit. Its sole prohibition is against the bringing of an action within six months after letters have been granted. Thomas A. Collito died June 15, 1953, and letters testamentary were granted defendant Michael B. Collito on July 28, 1953. We are informed that the complaint was filed December 29, 1954, some 17 months later.
Turning to Chapter 24 of Title 3A, dealing with the rights and remedies of decedents' creditors, we find none of the provisions of Articles 3 and 4 (N.J.S. 3A:24-3 to 12) applicable. N.J.S. 3A:24-3 provides that the court may order the executor or administrator to give public notice to creditors to present their claims in writing and under oath within six months. N.J.S. 3A:24-6 deals with the allowance or rejection of claims presented to the personal representative, and requires a creditor to commence an action to recover on the claim, or so much of it as is disputed, within three months after receiving notice that the claim or part of it has been disputed by the executor or administrator. N.J.S. 3A:24-7 to 12 are all dependent upon the issuance of an order limiting creditors under N.J.S. 3A:24-3. It may be said generally that none of them have the effect, except N.J.S. 3A:24-10, of completely barring a claim; they merely operate to exonerate the representative under certain circumstances.
In our view, the provisions of N.J.S. 3A:24-3 to 12 cannot and should not be interpreted to stand for the proposition that no suit may be instituted by a creditor unless his claim is first filed with and passed upon by the executor. If the executor desires the protection of the statute, he need only apply for and receive an order limiting creditors. If he does so, and properly follows the requirements of the statute and of R.R. 4:114-1, he may then take advantage *447 of the protection afforded him by the statute by pleading such order and the failure to file a claim. Absent an order limiting creditors, such defense is not available to him. Durbrow v. Eppens, 65 N.J.L. 10 (Sup. Ct. 1900); Ordinary v. Wolfson, 65 N.J.L. 418 (Sup. Ct. 1900); Ray Estate Corp. v. Steelman, 90 N.J.L. 184 (E. & A. 1917). In the Wolfson case it was said:
"The fourth case of demurrer is, the defendants being the executors of the obligor on the guardian's bond, that the fact that the declaration does not allege that proof of claim has been filed with them, makes it demurrable.
I do not so understand the law. The Orphans' Court act does not make that fact a bar to an action against an executor. The only bar to a suit against executors upon a claim against the estate of their testator is that found in section 70 of the Orphans' Court act [now N.J.S. 3A:24-7], which is that which attaches upon final decree of the Orphans' Court that all creditors who have not brought in their claims pursuant to the notice required by the statute shall be barred from any action therefor against the executor, but even that is subject to the qualification of the proviso of that section relative to after-discovered property of the testator. Pamph. L. 1898, p. 740, § 70." 65 N.J.L., at pages 420-421.
Defendant executor did not plead or prove an order barring creditors, because he had obtained none. The cited cases require the pleading and proof of an order limiting creditors in addition to the allegation and proof that no claim was filed with the executor, before the failure to file a proof of claim becomes a proper defense.

IV.
The primary point raised by defendants on their appeal appears to be that the trial court committed error when it permitted plaintiff, over defendants' objection, to introduce proof to establish that Sbaraglio was not paid twice for the same work on the South Orange building. They claim that plaintiff's proof of performance under the January 8, 1953 proposal to erect a complete basement and do certain other work at that location for $10,750 was new matter not raised by the pleadings or pretrial order, and *448 therefore should not have been received at the trial. This contention was argued at length at the trial and on the motion for a new trial. In denying the motion the County Court judge said that "the evidence offered by plaintiff in connection with the so-called receipt for $10,750 was properly adduced * * * it fell well within the issues raised by the pleadings and the pretrial order. * * *"
Defendants' contention runs thus: Their answer set up the affirmative defense that, aside from the factory contract of January 14, 1953, there was a collateral undertaking on January 8, 1953 involving the partial construction of the South Orange residence, and plaintiff's decedent had failed to abide by and perform that collateral undertaking according to its terms. Plaintiff filed no reply to this affirmative defense and made no effort to aver affirmative matters in avoidance of the collateral undertaking. Instead, he chose to deny the affirmative defense by serving no further pleading, R.R. 4:8-4. The argument is that under R.R. 4:7-1 and 4:8-4 plaintiff, if he intended to present testimony showing performance of the collateral undertaking, should have filed a reply averring matter constituting an avoidance of the affirmative defense.
We could follow the logic of defendants' argument were we able to find the affirmative defense of a collateral undertaking which they claim to have set up in their answer. If presented at all, it was only in the most tenuous and unclear fashion. Their first defense speaks of the factory contract not being "the true contract" between the parties, in that it did not reflect the true consideration involved; the second defense refers to Sbaraglio's receipt of $10,750, not properly credited against the contract price; and the fifth and sixth defenses speak of fraud and unclean hands in Sbaraglio's failing to disclose to defendants a credit of $10,750. Issue was joined on these defenses without further pleading. We find that defendants' answer failed specifically to charge that any part of the work had not been performed, or to allege a collateral agreement. Plaintiff cannot be required to plead an avoidance of a matter not pleaded.
*449 We have also examined the pretrial order. Paragraph 3 sets out at some length defendants' factual contentions. Again we find no mention made of a collateral undertaking, and no specific reference to work not performed by Sbaraglio. The specification of legal issues to be determined at the trial, set out in paragraph 7 of the pretrial order, contains no reference to defendants' claim of a collateral undertaking and a failure of that undertaking.
Since neither the pleadings nor pretrial order raised the issue here under examination, we turn to the testimony in order to ascertain whether the issue actually was tried, R.R. 4:15-2. Defendants' attorney had experienced some difficulty on cross-examination when he attempted to raise the issue as to the work on the South Orange residence. It was during the second day of trial that the judge notified counsel he had reexamined the leading case of Naumberg v. Young, 44 N.J.L. 331 (Sup. Ct. 1882), and inquired if counsel was attempting to offer proofs relating to the South Orange work as an agreement collateral to the main factory contract of January 14, 1953. When defendants' attorney said he was, the court then ruled that the evidence would be received as being within the exception set forth in Naumberg, 44 N.J.L., at page 335. The trial proceeded and counsel cross-examined plaintiff's witnesses primarily on the question of the collateral agreement. Similarly, the major portion of the testimony elicited from defendants' own witnesses related thereto. The collateral agreement thus became a major issue in the trial, and this to the knowledge of all concerned. What had theretofore been defendants' main claim  payment of $10,750 and Sbaraglio's failure properly to credit it against the factory contract price  fell out of the case. As a matter of fact, defendants' own testimony was clear that this sum was never paid to Sbaraglio by anyone.
It is basically unsound for defendants to argue now that they had the right to prove a collateral agreement (and this despite the fact that the pleadings and the issues framed *450 by the pretrial order failed to refer to it), and in the same breath claim that plaintiff might not in his turn offer proof in connection therewith.
R.R. 4:15-2 provides:
"When issues not raised by the pleadings and pretrial order are tried by consent or without the objection of the parties, they shall be treated in all respects as if they had been raised in the pleadings and pretrial order. Such amendment of the pleadings and pretrial order as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend shall not affect the result of the trial of these issues. * * *"
The rule appears to be premised on the view that since the court has tried the action on the merits, judgment will be rendered in accordance with the substantive law which governs the controversy. See, generally, Schnitzer and Wildstein, New Jersey Rules Service, A IV-380 ff. and Supp., p. 70 ff., for the history, scope and application of the rule. The issue of the collateral agreement and its performance was clearly recognized by the parties and actually tried. See Sattelberger v. Telep, 14 N.J. 353, 363, 364 (1954). Although no formal amendment of the pretrial order was made during the course of the trial, the quoted rule clearly permits such amendment even after judgment, and provides that failure so to amend shall not affect the result of the trial of the issue. See De Caro v. De Caro, 13 N.J. 36, 41 (1953); Colozzi v. Bevko, Inc., 17 N.J. 194, 203 (1955); Peschek v. Teissere, 30 N.J. Super. 248, 252 (App. Div. 1954). Had a formal request for amendment of the pretrial order been made of the County Court judge, it undoubtedly would have been permitted.
The evidence as to performance of the collateral agreement was clearly relevant and competent, and no objection was made to it on that score. The issue was fairly and clearly presented to the jury for its determination, and after considering the evidence it returned a verdict for plaintiff.

*451 V.
Defendants claim that the court erred in two portions of its charge. In the first, the court instructed the jury that the burden of proof was upon defendants to establish by a preponderance of the evidence their right to a credit of $10,750. The reference here was clearly to the defense described by the court as "in the nature of a defense of partial payment  this claim of credit." The charge was correct; ordinarily the burden of proving an affirmative defense is on the one who asserts it, as stated in the very case cited by defendants, Schomer v. Hoffman, 102 N.J.L. 347, 348 (E. & A. 1926).
The other portion of the charge criticized dealt with the proposition that if the collateral undertaking was performed, plaintiff was entitled to a verdict in the full amount. At the conclusion of the charge counsel for defendants formally objected "on the ground that I have already urged your Honor on that motion." It is completely obvious from a reading of the record that counsel's objection was not to the content of the charge, but to the fact that plaintiff was permitted to offer proof of performance of the collateral undertaking  a ground argued at length on plaintiff's motion for a direction of the verdict in the full amount of $17,590.64 due on the architect's final certificate under the factory contract. R.R. 4:47 does away with exceptions and requires only that a party, "at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor; * * *." The objection now made differs entirely from that urged upon the court.
This aside, we do not find prejudicial error in the portion of the charge under attack. Defendants point to the court's reference to a collateral undertaking "to construct a complete basement," claiming that Sbaraglio's proposal of January 8, 1953 also called for other items, such as the temporary road, rough grading, drain trench, etc. But *452 the court spoke generally about "a collateral undertaking," and the jury had with it in the jury room the very proposal upon which defendants bottom their claim of a collateral undertaking. It was not led astray.
Defendants also argue that the charge was not correct since the retaining wall was never built and the first floor beams not put in place until after the September 9, 1953 contract covering the South Orange premises was executed. Although the wall was not built, defendants are entitled to a credit of $1,200 for the wall when the South Orange contract is settled, in accordance with its express provisions. This will come about in the pending action brought by plaintiff against Sylvester & Co. to recover the balance due for the South Orange work. With respect to the floor beams, the architect issued certificate No. 1 for the South Orange residence on October 14, 1953, and under the terms of the contract that certificate was not due until, among other things, the "entire first floor beams have sub-flooring." The architect testified that the work was done when the certificate was issued. In any event, the work having been done, defendants were not charged twice for it and cannot be heard to complain.
We find the charge as a whole to be clear and correct. The test is whether ordinary jurors would fail to understand the instructions given, or be confused or misled. Ristan v. Frantzen, 14 N.J. 455, 461 (1954). The charge in its entirety meets that test.
The jury was instructed to bring in one of two verdicts, either $17,590.64 or $6,840.64, taking into account the $10,750 in dispute. The jury resolved the issues and brought in a verdict for the full amount due under the architect's final certificate. Having adverted to some aspects of the work done at the South Orange premises, it would not be amiss to complete the account by reference to some other aspects of the evidence. Dr. Collito himself testified that when his brother Thomas died on June 15, 1953, Sbaraglio had already opened a temporary road, cleared the land, excavated for a foundation, laid the footings and the basement *453 walls, and excavated for the drain line. The first floor beams and rough floor came later, as noted. Thus, except for the stone wall for which defendants will receive a $1,200 credit, the collateral undertaking was fully performed.
The formal contract for the South Orange residence at a price of $46,200, executed September 9, 1953, was based upon revised plans which substantially enlarged the premises. The original plans, under which Sbaraglio had carried out the collateral agreement, called for a house 75' 8" x 59'. The revised plans called for a house 82' x 66'. Under the latter, Sbaraglio would not only be called upon to change the foundations, but provide the additional labor and materials that the larger house called for, and this at a price $300 less than the proposal made on December 15, 1952, based on the original plans and which did not include electrical work, as did the formal contract.
There is no reason to assume that Sbaraglio would agree to a proposal to do more work for less money. It is reasonable to assume that in awarding the full balance due under the factory contract, the jury concluded that Sbaraglio had performed the collateral agreement and that the formal agreement of September 9, 1953 called for work above and beyond that originally contemplated under the first set of plans which, according to the testimony of the South Orange building inspector, had been approved back in November 1952.
The inference is strong that Dr. Collito, who admittedly enjoyed the confidence of his brother Thomas and who executed the formal contract for the South Orange house, in fact knew of the collateral agreement of January 8, 1953 and that the contract price of $46,200 did not include payment for the work mentioned in and performed under that agreement. It was an inference which the jury reasonably could have drawn in returning the verdict it did.

VI.
Defendants object to the trial court's exclusion of the four pages of notes made by attorney Abruzzese and *454 architect Centanni shortly before the execution of the factory contract on January 14, 1953. We find no error. Both men used these notes for the purpose of refreshing their memory and testified fully and completely as to their content, including the detailed breakdown of payments totalling $66,900. Whatever might be said about the court's refusal to admit the memorandum before this testimony came in, cf. Freeman v. Bartlett, 47 N.J.L. 33 (Sup. Ct. 1885), the memorandum was properly excluded after Abruzzese and Centanni had testified at length regarding its content. Springer v. Labow, 108 N.J.L. 68, 71-72 (Sup. Ct. 1931); Jackson v. Pioneer Adhesive Works, Inc., 132 N.J.L. 397, 400 (Sup. Ct. 1945).

VII.
Finally, defendants complain of error in the trial court's striking of their fifth and sixth separate defenses and excluding the evidence adduced thereon from the jury's consideration. The fifth defense was that Sbaraglio committed fraud in failing to advise and disclose to them a credit of $10,750. The sixth defense was unclean hands because of fraud and failure to disclose.
Defendants' first attack upon the court's action is a technical one based upon R.R. 4:12-6 which requires that a motion to strike a defense as insufficient in law must be made before responding to the pleading, or if no responsive pleading is permitted, within 20 days after service of the pleading. But plaintiff's motion was under R.R. 4:51. It was not directed to the fact that the defense was insufficient in law, but that there was a complete failure of proof of fraud, and that the theory upon which the case was actually tried was not fraud but breach of a contract to perform a collateral undertaking. Whether the court technically struck the defenses or merely removed them from the jury's consideration, as was done in its charge, is of no consequence.
Defendants also argue that the court was in error when, during the colloquy on the motion, it said that the *455 defrauded party could either rescind the contract or accept it and sue for damages resulting from the fraudulent representation. Actually, the court took the position that the defenses here in issue sought to bar plaintiff's cause of action completely, and that this could not be done. Further, the trial judge said that what defendants' damages might be on a counterclaim was not in issue, since none was filed nor were any damages proved. What the court said was correct. Siegel v. Smith, 115 N.J.L. 131 (E. & A. 1935). Since there was no proof as to damages other than the contention directed to the collateral undertaking, the issue as to the alleged credit of $10,750 was submitted upon proper instructions. The issue of fraud was rightly removed by the court from the jury's consideration.
Incidentally, defendants did not object to that portion of the court's charge which stated that there were only two possible verdicts, both in favor of plaintiff: he was entitled either to $17,590.64 with interest, or to $6,840.64 with interest, and which of these two verdicts the jury would arrive at would depend entirely upon its conclusions of fact, namely whether or not it found that defendants had proven their right to a credit of $10,750 by the greater weight of the evidence. Since they did not question that portion of the charge stating that in any event plaintiff would be entitled to $6,840.64, they conceded that the issue was as stated by the court and should not now be heard to argue that it erred in striking the defense of fraud, under which defense they might entirely escape liability and thereby become unjustly enriched.

VIII.
The trial court had the opportunity, on the motion to set aside the verdict and grant a new trial, to review the evidence and to consider the full argument made by counsel for defendants that the verdict was the result of mistake, partiality and passion, and was contrary to the weight of the evidence. It denied the motion. We are again reminded, *456 by what was said in Hartpence v. Grouleff, 15 N.J. 545, 549 (1954), of the superior position enjoyed by the trial judge to decide whether justice has been done under the particular circumstances and the weight of the credible evidence, and that his action should not be disturbed "unless it clearly and unequivocally appears there was a manifest denial of justice under the law." We do not find that situation present here.
That part of the County Court judgment dismissing plaintiff's second count against Michael B. Collito, executor of the estate of Thomas A. Collito, is reversed; the remainder of the judgment, in favor of plaintiff, is affirmed.