71 N.J. Super. 12 (1961)
176 A.2d 249
EILEEN LINDA PEER, AN INFANT BY HER GUARDIAN AD LITEM, ADELE PEER AND ADELE PEER AND HARVEY PEER, INDIVIDUALLY, PLAINTIFFS-RESPONDENTS,
v.
THE CITY OF NEWARK, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT, AND JOSEPH THOMAS, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued September 25, 1961.
Decided November 30, 1961.
*15 Before Judges PRICE, SULLIVAN and LEONARD.
Mr. Jacob M. Goldberg argued the cause for appellant (Mr. Vincent P. Torppey, attorney; Mr. Goldberg, Mr. Joseph A. Ward, Mr. Thomas M. Kane and Mr. Richard A. Walsh, on the brief).
Mr. Ira J. Zarin argued the cause for respondents (Messrs. Zarin & Yormark, attorneys; Mr. Zarin and Mr. Sheldon A. Weiss, of counsel and on the brief).
The opinion of the court was delivered by LEONARD, J.S.C. (temporarily assigned).
This is an appeal by defendant the City of Newark from a judgment *16 entered pursuant to jury verdicts against it and in favor of plaintiffs and from an order denying its motion for a new trial.
Defendant Joseph Thomas (Thomas) was appointed a police officer by defendant the City of Newark (city) on December 10, 1956, and since then has continuously engaged in that occupation.
On April 26, 1958 Thomas was off-duty all day and dressed in civilian clothes. He spent about three hours of that afternoon in a tavern consuming five or six bottles of beer. About 8:20 P.M. he returned to the apartment wherein he resided, went to the kitchen and removed his outer three-quarter length coat. He then entered the bathroom (6' x 8') for the purpose of using the toilet facilities. At the time, on his left side and attached to a belt supporting his trousers, he wore an off-duty holster in which he carried a loaded .38 calibre police service revolver. He removed this revolver from the holster with his right hand, intending to place it on a water tank about three feet from him. When the revolver was about one foot away from his body, it discharged.
Infant plaintiff, Eileen Linda Peer (Linda) lived with her parents, plaintiffs Adele Peer (Adele) and Harvey Peer (Harvey), in an apartment adjoining that of Thomas. At the time in question Linda was in the bathtub and her parents were in the kitchen. The Peer bathroom and the Thomas bathroom had a common wall about 6 1/2" thick.
The bullet from the discharged revolver passed through this wall and struck Linda, entered the left side of her neck, went through the upper part of her body and lodged against her seventh dorsal vertebra. As a result thereof, she suffered serious permanent injuries, hereinafter described in detail.
The following facts were admitted by city:
(1) Linda was struck by a bullet discharged from the police service revolver issued to Thomas on December 10, 1956.
*17 (2) City retained title to and was the owner of that revolver and bullet.
(3) Thomas, on the date in question, was a patrolman of the Newark Police Department and not under suspension.
(4) Thomas, as a member of the police department, was ordered to carry his police service revolver at all times during off-duty hours, except when on vacation, under suspension, sick or injured. (Emphasis added) (Manual of Procedure of Newark Police Department, § 420.)
Infant plaintiff Linda, through her guardian ad litem, plaintiff Adele, and plaintiffs Adele and Harvey, her parents, instituted action against defendant city based on active wrongdoing and against defendant Thomas based on negligence. At the trial verdicts were returned against both defendants in favor of Linda in the sum of $180,000, and in favor of her parents in the sum of $45,000.
Both defendants appealed therefrom, but the appeal of defendant Thomas was voluntarily withdrawn and a stipulation of dismissal thereof has been filed. Plaintiffs likewise, by stipulation, withdrew their cross-appeal from the court's dismissal of the second and third counts of the complaint relating to the negligent hiring of Thomas by city.
The grounds of the appeal of city are as follows:
I  The opinions of plaintiffs' experts in support of the claim of active wrongdoing on the part of city were incompetent and should have been stricken because they were based on only part of city's police training program.
II  Plaintiffs did not establish by competent proof that city failed to train and instruct officer Thomas adequately in the use and handling of a .38 calibre police service revolver.
III  The court erred in refusing to charge Nos. 1, 2, 3 and 7 of city's requests to charge, hereinafter set forth.
IV  The verdicts are against the weight of the evidence and the trial court's failure to grant a new trial constituted an erroneous exercise of discretion.
*18 V  The verdicts are excessive, lack evidential justification, and overlap.

I.
The basis of plaintiffs' claim of active wrongdoing by city was that its training program was inadequate; i.e., that it had inadequately trained or instructed Thomas in the safe use of the.38 calibre police service revolver. In support of this, two experts  one Donald MacNamara and one Paul Weston  testified for plaintiffs. No objection was, or is now, made by city as to their respective qualifications as experts in the field of firearms, firearm safety and police training. Each had varied and vast experience therein. At the conclusion of all testimony in the case, city moved to strike the testimony of both on the grounds that their respective opinions were not based on "all the facts in evidence at the end of the case" and, therefore, were incompetent.
MacNamara testified that in his opinion Thomas' training was "inadequate" in three particulars:
(1) No adequate instruction as to safety during off-duty hours.
(2) No adequate instruction as to the type of holster to be used during off-duty hours or in the carrying of the gun during the same period.
(3) No retraining program, i.e., Thomas had not fired his gun since his appointment  a period of 16 1/2 months.
Weston testified that city's training program of Thomas was "below standard  far below standard," and inadequate for substantially the same reasons.
A consideration of an outline of city's training program with reference to service revolvers is pertinent. On the first day, Lt. Frank Spiessbach, the officer in charge of training for the police department, gave an hour lecture and a short talk, including demonstrations; certain "give away" material was distributed; a lecture and demonstration *19 were given by one James J. Tracey, a member of the F.B.I.; the trainees engaged in dry and actual range shooting practice; an F.B.I. motion picture was shown. On the second day, Tracey delivered another lecture; they again participated in dry and actual shooting practice, and they were shown another F.B.I. motion picture. On the third day, there were another F.B.I. film and more range firing practice.
Plaintiffs placed the following in evidence:  the .38 calibre revolver, the bullet, the off-duty holster, two other holsters, an hour-by-hour schedule of the entire training program, the details of the range schedule, the mimeographed "give away" material, an outline of Lt. Spiessbach's lecture, Manual of Rules of Police Department, Manual of Procedure of Police Department, and a portion of depositions of Thomas and Lt. Spiessbach.
Both experts testified that they had read all of the above prior to trial and were familiar with their contents. MacNamara stated he knew the contents of the F.B.I. lectures from his previous experience; that he had seen some F.B.I. films and was, therefore, familiar with the ones shown; that he had knowledge of city's entire training program because, in 1957, when he was "Director, New Jersey Municipal Police Survey," he was furnished a complete outline of all its training programs, including an hour-by-hour detailed account thereof.
Weston likewise testified, by reason of experience, to familiarity with the F.B.I. course of instruction and declared he had a "pretty good idea" of the contents of the F.B.I. films.
The crux of city's objection is that these experts based their respective opinions on only part of city's training program, i.e., they personally did not hear the lectures of Lt. Spiessbach or Tracey, did not see their demonstrations in connection therewith, and did not see the three F.B.I. films. Thus, argues city, their testimony was incompetent and should have been stricken.
*20 Preliminarily, it is noted that this objection factually cannot be directed to all of their testimony. In the depositions previously mentioned, both Spiessbach and Thomas conceded that the latter had not received any retraining. Likewise, Thomas testified therein that his off-duty holster was not issued to him by city; he purchased it at a clothing store; there were no regulations as to the type of off-duty holster he could use; he was not told what type to wear; he could wear "what you please." Thus, these two aspects of their opinions were based entirely upon facts in evidence.
We shall next consider the competency of the balance of their testimony. In Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77, 85-86 (App. Div. 1961), the court said:
"The ability to render expert opinion is by definition beyond the experiential capacity of the ordinary layman. See 2 Wigmore, Evidence, § 556, p. 635. In fact, the primary justification for lifting the ban on the admission of opinion testimony, in the case of experts, is the relative helplessness of the average juror in dealing with a subject not of common knowledge; thus our cases speak of the `necessity' or `reasonable necessity' for expert opinion. Beck v. Monmouth Lumber Co., 137 N.J.L. 268, 277 (E. & A. 1948); Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 141-142 (1950); Thompson v. Pennsylvania R.R. Co., 51 N.J.L. 42, 46 (Sup. Ct. 1888); Pincus v. Sublett, 26 N.J. Super. 188, 192 (App. Div. 1953); certification denied 13 N.J. 294 (1953); see 7 Wigmore, supra, § 1923, pp. 21-22.
To insure, however, that the flow to the jury of `expert' information is not wholly bogus in nature, there has developed the safeguard implicit in the preliminary process of `qualifying' the witness, the control of which is almost invariably left to the sound discretion of the trial judge. Cowdrick v. Pennsylvania R.R. Co., 132 N.J.L. 131, 141 (E. & A. 1944); Bosze v. Metropolitan Life Ins. Co., 1 N.J. 5, 10 (1948); Zampieri v. River Vale Tp., 29 N.J. 599, 611 (1959); see 2 Wigmore, supra, § 561, pp. 641-643. And as a further check on the funnelling of improper or legally irrelevant conclusions to the trier of fact, our law has fashioned the principle that the opinions of experts must be founded either upon facts within their own knowledge or, in the case of a hypothetical question, upon facts and inferences supportable by the proofs  i.e., evidence which there is a fair possibility the jury will accept. Beam v. Kent, 3 N.J. 210, 215 (1949); Stanley Co. of America v. Hercules Powder Co., 16 N.J. 295, 305-306 (1954); Fink v. City of Paterson, 44 *21 N.J. Super. 129, 135 (App. Div. 1957); see 2 Wigmore, supra, § 682, p. 805.
Once these hurdles are overcome, the credibility of the expert and the weight to be accorded his testimony rest in the domain of the trier of fact. 20 Am. Jur., Evidence, § 867, pp. 731-732; see Kreis v. Owens, 38 N.J. Super. 148 (App. Div. 1955). Unless contrary to common sense, common knowledge, or recognized physical laws, or based on primary facts absent from the proofs, the expert's statements are to be sifted by the jury like other testimony. See Annotation, 136 A.L.R. 965 (1942); 66 A.L.R.2d 1082 (1959); see 32 C.J.S. Evidence § 569a, p. 392. The testimonial and experiential weaknesses of the witness, * * * may be exposed by the usual methods of cross-examination. He may be required to detail the premises upon which his observations are based, 2 Wigmore, supra, § 672, pp. 792-793, and these premises, as well as his ultimate conclusions, may be contradicted by rebuttal experts and by other evidence of the opposing party. Panko v. Grimes, 40 N.J. Super. 588, 596 (App. Div. 1956); Kelly v. Martino, 375 Pa. 244, 99 A.2d 901, 902 (Sup. Ct. 1953)." (Emphasis added)
There must be a proper foundation for the expert's testimony. Schumann v. Horn & Hardart Baking Co., 8 N.J. Super. 153 (App. Div. 1950). If the "opinion" is so completely lacking in proper foundation as to be worthless, it is not admissible. Skupienski v. Maly, 27 N.J. 240, 246 (1958). It is valueless unless it is rested upon the facts in evidence which are admitted or proved. (Where a question is so indefinite as to admit of no answer except as mere guesswork it has been held to be prejudicial error to overrule the objection thereto.) Stanley Co. of America v. Hercules Powder Co., supra, 16 N.J., pp. 305, 306.
It is not necessary that hypothetical questions should embody all the facts exhibited by the evidence. It is sufficient, on the contrary, that they embody such a state of facts fairly within the range of evidence, as counsel propounding them deemed to have been proved. Daggett v. North Jersey St. Ry. Co., 75 N.J.L. 630, 637 (E. & A. 1907); Schnoor v. Palisades Realty Co., 112 N.J.L. 506 (E. & A. 1934).
City relies upon Rempfer v. Deerfield Packing Corp., supra, for the proposition that an expert cannot give an *22 opinion without considering "all" the data, facts and circumstances. We do not agree with this construction. Rempfer only requires consideration of all the facts pertinent to the inquiry. As the court said, at page 145 of 4 N.J.:
"The jury cannot indulge in mere speculation and surmise and this is equally true of an expert witness. The opinion of the plaintiff's expert here is so completely lacking in proper foundation as to be worthless and therefore not admissible." (Emphasis added)
The expert therein who attempted to testify as to reasonable future profits of an amusement park had no knowledge of past profits, the number of employees, their wages, method of operation, competition or the facilities enjoyed. In the case at bar, both experts based their opinions upon facts within their own knowledge and upon the pertinent facts and documents in evidence. Consequently, there was a proper foundation therefor, they were competent and the trial court correctly refused to strike them.
Furthermore, city's motion was based upon all the evidence at the completion of the entire case. City's witnesses and evidence did not disclose any facts contradictory to or in addition to those upon which plaintiffs' experts relied.
We deem this point to be without merit.

II.
City contends herein that (a) the court committed reversible error in denying its motion for judgment of dismissal at the end of the entire case and (b) plaintiffs did not show a causal relation between city's training and the shooting.

(a)
We have previously discussed the basis of plaintiffs' charge of active wrongdoing. At the trial, both plaintiffs and the court relied on McAndrew v. Mularchuk, 56 N.J. Super. 219 (App. Div. 1959). It has since been affirmed, *23 33 N.J. 172 (1960). In the Appellate Division, Judge Conford said, 56 N.J. Super., at page 228:
"If the inadequacy of Mularchuk's training was proximately related to the injury of the plaintiff, as a jury could have found, the employing municipality can be held for its own negligence in assigning him to police duties, armed with a gun, entirely without regard to the doctrine of respondeat superior. A question of fact was presented as to whether what actually transpired was a reasonably foreseeable consequence of the municipality's default. Wilson v. Brauer, 97 N.J.L. 482, 484, 485 (E. & A. 1922); cf. Mazzilli v. Selger, 13 N.J. 296 (1953); Kress v. City of Newark [8 N.J. 562], supra. Any such negligence was participated in by the chief of police of the municipality and those who were in charge of the police department prior to his time, thereby bringing liability home to the municipality within the traditional requirements of direction or participation.
There is no problem in finding the wrongdoing of the municipality to have been active, in line with such cases as Hartman v. City of Brigantine [42 N.J. Super. 247]; Kelly v. Curtiss [29 N.J. Super. 291], and Casale v. Housing Authority, City of Newark [42 N.J. Super. 52], all supra." (Emphasis added)
The Supreme Court sustained the Appellate Division's determination that a jury question was presented on the theory of active wrongdoing. Justice Francis stated, 33 N.J., at page 184:
"Municipal entities must take cognizance of the hazard of side-arms. That knowledge casts an obligation on them when they arm or sanction the arming of reserve patrolmen for active police duty. The obligation is to use care commensurate with the risk to see to it that such persons are adequately trained or experienced in the proper handling and use of the weapons they are to carry * * *." (Emphasis added)
And, 33 N.J., at page 196:
"We further conclude that in the present state of the proof the borough may be found liable for that shooting on the theory of personal active wrongdoing in authorizing Mularchuk, when on duty, to carry a revolver without any training, or adequate training in its handling and use, * * *" (Emphasis added)
City contends that the case at bar is distinguishable from McAndrew, supra, in that the officer therein was never *24 given any training in handling or shooting the revolver. It argues that the factual situation in the instant case is entirely different in that Thomas was trained, as disclosed by the evidence. This, in our opinion, is an unwarranted limitation upon McAndrew since, as above quoted, it considered the "adequacy" of the police officer's training.
Considering all the evidence in the light most favorable to plaintiffs, we conclude the court was correct in submitting this issue to the jury. See Wilson v. Savino, 10 N.J. 11, 18 (1952).
We shall discuss the three particulars wherein MacNamara and Weston testified that Thomas' training was inadequate.

OFF-DUTY TRAINING.
Both testified that since, by regulation, he was required to carry a loaded police service revolver while off-duty, he should have received specific safety training therefor and that such rules should have been spelled out. MacNamara said:
"* * * there is quite a difference between range safety where men are under supervision * * * of fellow officers and where they are in a formal instructional situation, and the off-range situation where they are either on duty working unsupervised or where they are on non-scheduled off-duty hours and not supervised at all." (Emphasis added)
He further stated that departmental instructions and regulations should be promulgated as to safe procedure for disarming oneself preparatory to using bathroom facilities. His testimony was:
"This has been a long-time problem, particularly with holsters that are attached to the belt of the trousers. The general rule that the gun should not be removed from the holster except when the gun is going to be fired or cleaned is the best safeguard in these circumstances. If the gun is to be taken off the belt so that the trousers may be dropped without the gun falling out of the holster or banging on the floor, the entire holster with the gun in it should be removed. *25 In this way it would be a safe removal. The gun should not be removed from the holster and the holster left on the belt." (Emphasis added)
Weston stated: "On a man's free time when he goes off in fact that's our roughest time." With regard to disarming oneself to go to the bathroom, he stated:
"He should take it off with the gun in the holster intact. He should place it in a position that is within his immediate control so that nobody can reach and get it and shoot him and he should handle it as little as possible. Take it off the belt, put it down in front of him or in his underwear or pants and not forget it when he walks out." (Emphasis added)

THOMAS' OFF-DUTY HOLSTER.
MacNamara testified as follows:  there was no adequate instruction as to the type of holster to be used during the off-duty hours; there was no safety device thereon such as a strap to keep the gun from falling out; the special difficulty with this type of holster is that the law of gravity does not (sic) operate  when a person's pants are taken off, the gun falls out (it had fallen out twice before when Thomas went to the bathroom); this type required him unnecessarily to remove the gun from the holster.
Weston testified that there should be specification of an approved type of off-duty holster, and an inspection to see that the right type was procured; Thomas' off-duty holster was dangerous  it was a "gimmick" type; that in going to the bathroom, the gun and holster should be removed as one unit.

RETRAINING.
The testimony of MacNamara was that there should have been retraining in marksmanship and safety at least once a month. Weston placed a minimum of three times a year as standard. Both of them testified that the benefit of retraining is that the instructions as to safety and other *26 factors are better implanted in the officer's mind and that he has more respect for his revolver and its dangerous propensities.
City offered as witnesses Lt. Spiessbach, F.B.I. Agent Tracey and five officers who were members of its police department. All of these witnesses, experienced in handling revolvers and in the instruction thereof, participated in the training of Thomas' class. Their testimony detailed that program.
Spiessbach repeated the lecture he had delivered, which followed the "outline" thereof and the "give away" material (in evidence in plaintiffs' case). It included demonstrations on the range in the loading, unloading, cocking, safing, holstering and unholstering of the police gun. It further included general references to safety, i.e., "Consider all guns loaded until proven otherwise," "Point gun safely at all times," "Keep it in a safe place," "Be prudent," "Revolver is a deadly force," "Don't use except in extreme case."
Tracey detailed the three days of his instruction, which was primarily the teaching of the F.B.I. Practical Pistol Course. This consisted of dry and actual range firing and included handling, loading, unloading, holstering, unholstering and "general rules" of range safety.
The other witnesses detailed their participation in the training program.
The three F.B.I. films were exhibited to the jury. At the oral argument, this court viewed the same. Primarily they dealt with firing, single and double action, on the range and under simulated combat activity. The reference therein to safe handling of the revolver was sparse and limited to range instruction.
City's witnesses conceded that Thomas was not specifically instructed on off-duty safety and that the written material, including both police manuals, made no specific reference thereto. It was their opinion that there was no difference in the safe handling of a revolver whether it be on the *27 range, in the home or elsewhere. Consequently, they said, specific off-duty safety training was not necessary. However, on cross-examination, Tracey admitted "certain [safety] problems may come up off duty that are not experienced on the range."
City's witnesses further admitted that there was no specific instruction or regulation as to the type of off-duty holster to be worn by Thomas, or for the inspection thereof. Tracey characterized the F.B.I. holsters shown him as "form-fitting" and stated they kept the weapon snugly therein, and that Thomas' off-duty holster was not a "form-fit" one. He explained that the F.B.I. issued the holster with the weapon, and while the men (F.B.I.) were not required to wear the issued one, they were required to use the same type. He further testified that the F.B.I. practice in withdrawing a gun from a holster is to take it out first, unload it, and then "bench," and that it never instructs its trainees to remove the gun and holster as a unit.
Likewise, it was not disputed that Thomas received no retraining. Tracey admitted that the F.B.I. men have four outdoor and four indoor shoots a year. The F.B.I. pictures referred to "on-training" (retraining). Nevertheless, city's witnesses testified that retraining was only necessary to improve marksmanship and was not necessary for safety.
City's experts, contrary to plaintiffs', opinioned that Thomas was adequately trained. Thus, a jury issue was created.

(b)
The actual cause of the discharge of the revolver on the evening of the incident involved herein was never actually disclosed. Thomas, in his depositions, stated that he could not say what caused it to discharge; he did not know whether he cocked it or pulled the trigger before it went off but that he did not drop it. As a witness he testified *28 that he positively did not pull the trigger; he did not drop it or hit it against anything, and as he withdrew the gun from the holster with his right hand, he had his finger on the grip thereof and not on the trigger, but nevertheless it went off. One Jack Weller, an expert in firearms, testified for plaintiffs that he examined and tested Thomas' revolver shortly thereafter in the presence of Lt. Spiessbach; that the gun was in proper working order and safe, and the only way it could have been discharged was by physically pulling the trigger. In depositions offered in evidence by plaintiffs, Spiessbach concurred therewith. Thomas further, in his depositions, stated he was not "too familiar" with the workings of his service firearm; he did not remember any of the instructions he had received relevant to its mechanical workings. He even admitted he was unable to identify the basic parts of the weapon.
It is clear that upon any version relating to the discharge of the gun, a jury issue as to proximate cause was presented. Liability attaches not only to the dominating cause but also to any cause which constitutes at any event a substantial factor in bringing about the injury. Hartman v. Brigantine, 42 N.J. Super. 247, 261 (App. Div. 1956), affirmed 23 N.J. 530 (1957); Lutz v. Westwood Co., 31 N.J. Super. 285 (App. Div. 1954), certif. denied 16 N.J. 205 (1954).
Likewise, upon this same theory, there was sufficient evidence of causal relation between Thomas' defective holster, the failure to inspect the same, and the incident involved. Thomas' depositions and testimony were that he removed the gun from the holster because twice before, on going to the bathroom, it fell out. This, when considered in the light of the testimony of plaintiffs' experts with reference thereto, clearly creates the inference that if the holster had not been defective, there would have been no necessity to remove the revolver and it would not have been discharged.

*29 III.
City requested the court to charge the following, which it failed to do:
"1. If you find from the proofs that the training given by the Federal Bureau of Investigation in the safe use and handling of firearms was adequate and that the City of Newark conformed to the F.B.I. standard in training Thomas in the safe use and handling of firearms, then you must find that the City of Newark exercised reasonable care in the training of Thomas and your verdict must be one of no cause of action in favor of the City of Newark.
2. If you find from the proofs that the training given by the Federal Bureau of Investigation in the safety and handling of firearms was adequate and, more particularly, that the defendant Thomas was instructed that in taking out his loaded gun from the holster that he was first to empty the barrel of its bullets; and that on April 26, 1958, defendant Thomas took his gun out of the holster to place it on the water tank and failed to unload the gun in violation of such instruction; and if you find that such handling of the gun was improper and caused the injuries to the infant plaintiff, then your verdict must be one of no cause of action in favor of the defendant, the City of Newark.
3. If you find that the training in the safe use and handling of firearms given by the F.B.I. was adequate, then in determining whether Newark's training was adequate you must consider whether the training given by Newark was similar to that set up by the F.B.I. and that in fact such program was set up by the F.B.I. to be followed by all municipalities, and if you find that the training program in the safe use and handling of firearms, given by Newark to Thomas was similar to that program set up by the F.B.I. then you must conclude that Newark exercised reasonable care in training Thomas and your verdict should be one of no cause for action in favor of the City of Newark.

* * * * * * * *
7. In deciding the issue of whether or not the City of Newark failed to provide proper training to defendant Thomas, you must bear in mind that there is no established standard of training police officers either by statutory or case law and the testimony of the plaintiffs' experts is only their opinions and their statements are not conclusive and binding upon you in reaching your verdict. You must consider not only their testimony, but also all the evidence produced on behalf of the City of Newark in support of its contention that the training given Thomas was adequate."
The court in its charge, to which no objection was made, thoroughly restated city's evidence of Thomas' training and *30 properly propounded the test to be applied concerning its liability. Requests Nos. 1, 2 and 3 were premised on F.B.I. evidence. The F.B.I. did not train Thomas  city did. The evidence, contrary to the requests, clearly established that city's program and the F.B.I. program were not coextensive. If charged, the requests would have been misleading and confusing. See Ristan v. Frantzen, 14 N.J. 455 (1954).
The court substantially charged request No. 7 in the following language:
"You should consider such expert opinion and should weigh the reasons, if any, given for it. You are not bound, however, by such an opinion. Give it the weight to which you deem it entitled, whether that be great or slight, and you may reject it if in your judgment the reasons given for it are unsound.

* * * * * * * *
The existence of standards for the training of police officers in the safe handling of their firearms although evidential as to what is the reasonable standard for such training does not conclusively establish the care a municipality must exercise in the training of its police officers in such safety procedures."
Viewing the charge as to liability, we conclude it correctly and intelligently stated the pertinent legal principles.

IV.
All factual and legal contentions hereunder have been adequately covered under II. The issue of the adequacy or the inadequacy of Thomas' training was clearly placed before the jury. Their verdict should not be set aside as being against the weight of the evidence unless it clearly and convincingly appears that it was the result of mistake, partiality, prejudice or passion, R.R. 1:5-3(a), 2:5, or that there was a manifest denial of justice under law. Hartpence v. Grouleff, 15 N.J. 545, 549 (1954); Palumbo v. Collito, 42 N.J. Super. 436, 455 (App. Div. 1956), certif. den. 23 N.J. 139 (1957). The same rule applies to the denial of city's motion for a new trial. Kavanaugh v. Quigley, 63 N.J. Super. 153, 157 (App. *31 Div. 1960). Further, we are reluctant to disturb an order refusing a new trial where the error asserted is largely a matter of how much weight should be accorded competing expert opinion. Coll v. Sherry, 29 N.J. 166, 173 (1959).
The evidence herein does not mandate disturbance of the verdicts or the trial court's action.

V.
Plaintiffs' testimony as to Linda's resultant permanent injuries and disabilities was not controverted. None of the witnesses who testified thereto were cross-examined and city offered no evidence pertaining thereto. The course of the bullet has been described previously. During its travels it punctured her lung, fractured ribs, and left a track of metallic fragments.
She immediately suffered complete paralysis from the middle of her chest down; intercostal muscles which controlled breathing, abdominal muscles, muscles which controlled the functions of the bowel and bladder and lower extremities, were all totally paralyzed. An operation to remove the bullet and to explore the damage to her spinal cord was performed. She remained at Martland Medical Center about three months. During that time, there was no improvement and she developed, in addition, spastic paraplegia resulting in tremors. She was then removed to Kessler Institute for Rehabilitation, where she remained for about 13 1/2 months. While there, she received psychological counsel and physical rehabilitary exercises and treatment. When she left, there was no lessening of her paralysis. With special braces and crutches she was able to ambulate for about 60 yards in a "swing through gait." Without both of these supports she could not stand. Since then she developed an ulcer on her buttocks which further limited her activities. She requires constant catheterization and must wear at all times a complete set of urinary appliances. Rectal irrigation and suppositories are required daily.
*32 In addition to the above, testimony was adduced as to her pain and suffering and her psychological problems, both during hospitalization and thereafter.
Two doctors testified that her paralysis is permanent and it will remain in its present condition for the rest of her life. Both opinioned that she will never experience sexual feelings or motherhood; that she is more susceptible to infection and disease, particularly urological, ulcers and high temperatures; that she is and will be in need of constant checkups every six months.
The evidence disclosed present and future need of the following  complete set of urinary appliances, a couple of high fabric corsets (to support her trunk), crutches, wheel chair, long bilateral leg braces with supporting parts, special shoes and a hospital bed. The braces will have to be changed yearly as she grows or gets heavier, and she will need a new wheel chair every four or five years.
Her life expectancy, based on actuarial tables, was stipulated to be 63.28 years.
The following expenses were in evidence  Kessler Institute, $8,850; wheel chair, $229.05; braces and shoes, $342.93; crutches, between $40 and $60 per pair; special bed, $400; checkup at Kessler, $10  the total approximates $9,900.
In the future she will need the following  new braces every year, special shoes and corsets, crutches, wheel chair, checkups at Kessler Institute once every six months at $10 each, urological checkups once every six months at $100-$250 per checkup, and constant nursing at a minimum cost of $10 per day.
The court's charge as to damages was as follows:
"Now, in the event you determine that the infant plaintiff is entitled to your verdict, your verdict should be returned in her favor in one lump sum of money damages comprised of the following elements: fair and reasonable compensation for the injuries sustained which you find were proximately caused by the accident, for the effect of those injuries upon her health, whether temporary or permanent, in whatever degree you determine in accordance with the *33 facts, for the pain and suffering she endured for so long a time you find she did in fact suffer or will in fact suffer and for such reasonable expenses as you determine from the evidence to which she personally in the future will be compelled to expend for medical and rehabilitation treatment and care.
Now, the action brought by the plaintiffs, Adele Peer and Harvey Peer individually as parents of the infant plaintiff, is a derivative action, namely their claim as derived from the claim of the infant plaintiff. They will be entitled to your verdict only in the event you determine that the infant plaintiff is entitled to your verdict. In the event that you determine that the infant plaintiff, Eileen Linda Peer, sustained injuries as a proximate result of the defendants' negligence you should also return a verdict in favor of the plaintiffs, Adele Peer and Harvey Peer, in one lump sum comprising such reasonable expenses as you find that they incurred and will in the future incur in an effort to cure and lessen the extent of the injuries sustained by their daughter which were proximately caused by the accident, including of course, reasonable medical bills, hospital and rehabilitation center bills and such other reasonable expenses as have been required and will in the future be required for the care and treatment of their daughter." (Emphasis added)
City contends that the italicized portions of the above overlap in that no distinction is made between the minority and majority of infant plaintiff and that therefore there was caused double recovery for these expenses. It further argues that the parents are limited to recovery therefor only during minority and the infant only beyond her majority. Having failed to object thereto when given, it urges the same was prejudicial and constituted reversible error under R.R. 1:5-3(c), 2:5.
While there are two views on the subject (see 39 Am. Jur. ¶ 80, p. 726; 37 A.L.R. 11, 37; 32 A.L.R.2d 1075), New Jersey follows the rule that the parents are entitled to recover for medical expenses actually incurred and to be incurred in the future for the care of an infant. Mathias v. Luke, 37 N.J. Super. 241, 246 (App. Div. 1955); Marcinko v. Sauer, 8 N.J. Misc. 127, 149 A. 69 (Sup. Ct. 1930); Murray v. Cohen, 4 N.J. Misc. 139, 132 A. 221 (Sup. Ct. 1926).
That right of the parents includes the right to recover future medical expenses to be incurred after the infant *34 reaches majority. Wood v. Morris & Co., 2 N.J. Misc. 1010, 126 A. 434 (Sup. Ct. 1924). The court said, 2 N.J. Misc., at page 1012:
"* * * the expense to the father is not confined to a period ending with the beginning of the suit, but the jury should properly be required to consider what reasonable expense he would in all probability have to incur without limit as to time, certainly until the majority of the infant, and perhaps even after that if the young man should not be restored to health and should be dependent upon his father for aid. It was manifest that the younger plaintiff could not be restored to sound health without an important operation which would be very expensive and for which, very probably, the father would have to pay. The duty of support in the case of an `impotent person or other poor person not able to work' does not end at majority, but may continue indefinitely."
In the instant case, the evidence clearly established that Linda would never be restored to sound health; she would always be helpless and dependent upon her parents or others for assistance.
In support of its urged position with respect to these damages, city cites the following cases  Clarke v. Eighth Ave. R.R. Co., 238 N.Y. 246, 144 N.E. 516, 517, 37 A.L.R. 1 (N.Y. Ct. App. 1924); Philadelphia Traction v. Orbann, 119 Pa. 37, 12 A. 816 (Sup. Ct. 1888); Netherland-American Steam Nav. Co. v. Hollander, 59 F. 417 (2 Cir. 1894); Trevorrow v. Boyer, 52 N.J. Super. 215, 218 (Law Div. 1958). None of them does so.
Philadelphia and Trevorrow, supra, did not consider the issues involved herein; the former dealt with exemplary damages and the latter with a notice to be given to the Unsatisfied Claim and Judgment Board. Clarke, supra, discussed the right of the parents to recover prospective medical expenses only during minority of the infant. In Netherland, supra, the "minority limitation" was confined solely to damages for loss of services.
As to past medical bills and expenses, there is no basis for the allegation that the charge overlapped. Recovery *35 for these was limited to the parents; no mention was made thereof in the portion directed to Linda.
As to future bills and expenses, we agree that the charge does overlap. City argues by reason thereof it may be assumed there was a double recovery therefor. Such assumption, however, is unwarranted. The court's inadvertence was a technical one, unnoticed even by counsel at the time, and if it appears that the jury did not make a double award, no prejudice can be claimed.
We have previously determined that the parents were entitled to the recovery of damages for future bills and expenses, and the verdict of $45,000 in favor of the parents clearly indicates that the jury awarded such damages to them. Considering the expenses already incurred and adding thereto these future bills and expenses, we arrive at a sum comparable with the amount of their verdict. Even if we limit the consideration of these bills and expenses to the period of Linda's minority, the result would be the same. Thus, this verdict cannot be considered excessive.
We turn to the verdict in favor of the infant plaintiff. Eliminating all bills and expenses therefrom and considering only her injuries and resultant disabilities, as previously set forth, we conclude that her verdict was not excessive. It is supported by the evidence and cannot be characterized to have been the result of mistake, partiality, prejudice or passion.
In view of the above, we conclude that the jury did not make a double award. Consequently, we find no prejudice to city and no reason to invoke the plain error rule. See Valls v. Paramus Bathing Beach, Inc., 46 N.J. Super. 353, 358 (App. Div. 1957).

RESPONDEAT SUPERIOR.
Having considered all points raised by city, we turn to an additional reason urged by plaintiffs for affirmance. *36 They urge that the verdict is now sustainable on a theory of respondeat superior. Subsequent to trial of the instant case, the Supreme Court decided in McAndrew v. Mularchuk, supra, that a municipality could be held liable for the commissive negligence of its employees under the doctrine of respondeat superior regardless of the employee's status. The requirement of direction or participation by the municipality through a high level agent has been eliminated. However, a verdict cannot be sustained on appeal upon a theory not submitted to the jury's determination. Cook, Ad'r v. American E.C. & Schultze Gunpowder Co., 70 N.J.L. 65 (Sup. Ct. 1903). Generally, a party is restricted on appeal to the theory on which the cause is tried, and may not urge a new theory, especially if inconsistent on appeal. Buccafusco v. Public Service Electric & Gas Co., 49 N.J. Super. 385, 396-397 (App. Div. 1958), certif. den. 27 N.J. 74 (1958); Gebhardt v. Public Service Coordinated Transport, 48 N.J. Super. 173, 181-182 (App. Div. 1957), certif. den. 25 N.J. 540 (1958); 4 C.J.S. Appeal and Error § 241e.
In the case at bar, plaintiffs included a count of respondeat superior which, although not stricken, was during the course of trial expressly removed by plaintiffs as an issue in the case. Counsel for plaintiffs on two occasions during city's motion for dismissal, stated to the court with reference to an agency relationship existing between city and Thomas at the time of the shooting: "There is no allegation of agency, respondeat superior," and "We don't contend agency." Plaintiffs' theory was active wrong-doing, i.e., inadequate training by the police officers in charge of city's training program. That was the theory upon which this case was submitted to the jury and upon which the jury determined it. Under these circumstances we give no consideration to the theory of respondeat superior now advanced by plaintiffs.
Affirmed.