MARVIN REMPFER, PLAINTIFF-RESPONDENT, v. DEER-
FIELD PACKING CORPORATION, CHARLES F. SEA-
BROOK, JOHN M. SEABROOK AND ALLIE J. FRALIN-
GER, DEFENDANTS-APPELLANTS.

Argued February 14, 1950—Decided March 13, 1950.

*Mr. Samuel P. Orlando* argued the cause for all appellants; attorney for appellants Charles F. Seabrook and John M. Seabrook. (*Mr. Douglas V. Aitken,* attorney for appellant Deerfield Packing Corporation. *Mr. LeRoy W. Loder,* attorney for appellant Allie J. Fralinger.)

*Mr. Robert G. Howell* argued the cause for respondent (*Messrs. Stanger & Howell,* attorneys).

The opinion of the court was delivered by

WACHENFELD, J. This is an appeal to the Appellate Division from the judgment rendered in favor of the plaintiff below for $20,000, certified here by us.

The complaint was unusually long, originally containing thirty counts, many of which were dismissed, so that when the case went to the jury the only counts remaining were those sounding in nuisance.

The plaintiff is the owner of an amusement park called Tumbling Dam Park on Sunset Lake in Cumberland County, New Jersey. His property consisted of four tracts, one of which ran to the approximate center of the lake, two of the remaining three tracts consisting of upland property, while the last tract ran to the water's edge and carried with it an easement for boating, fishing and bathing purposes. The plaintiff's operations included a boat house, music stand, open-air dance floor, dodge-em, skating rinks, a merry-go-round, bath houses and other amusements from which he derived revenue, but no charge was made for the bathing privilege itself, which was used as a "leader."

Five miles north of the amusement park, the defendants, referred to collectively as Deerfield, operated a farm and processing plant, devoted to quick-freezing, canning and dehydration of various types of vegetables. The plaintiff contends that waste products from this plant were discharged into a stream, ultimately reaching Sunset Lake, causing pollution and consequent damage to the plaintiff's business during the six years from January 1, 1941, to December 28, 1946. The pollution was described as floating solids and masses of green materials on the surface of the lake, accompanied by disagreeable odors.

Deerfield produced and used its own water in its processing and contends its canning and quick-freezing operations were materially increased during the war because of Government demands and that under the War Manpower Act the Government had a right to demand these facilities, although it admits they were voluntarily supplied by the defendant. There was proof of this in the testimony of the former Quartermaster General of the United States Army. There was evidence of consulting chemists and biologists concerning two violent storms, one in 1934 and one in 1940, which washed away the dams and gates of Sunset Lake and deposited great

quantities of organic material, dirt, roots, tree stumps and other matter in the lake. The lake was refilled without dredging or cleaning the bottom. This, plus the weather conditions, precipitation and run-off of waters in the water shed between 1940 and 1946, caused the acceleration of the growth of algae, which, according to the expert testimony, was the cause of the unpleasant odor, the deposits and the discoloration of the water in Sunset Lake.

Another expert testified that the system utilized by the defendant for disposing of factory waste, water and effluent from domestic septic tanks of the type used by the defendant corporation was recognized as the acceptable practice for the treatment of sewage under the then existing conditions and the defendant contended it had made no unreasonable use of its property in that it had used all standard and modern means of equipment and methods to dispose of its waste and that the conditions complained of by the plaintiff existed because they were due to natural conditions over which the defendant had no control.

The plaintiff proceeded upon the theory and offered proof that his property had been damaged by the deposit of polluted sediment on that part of the lake bed to which he claimed title and, as a result, odors and other unpleasant instances of pollution occurred occasioning him loss of profits which he would have realized from the use and enjoyment of his property as an amusement park but for the unlawful acts committed by the defendants.

The trial lasted more than four weeks and sixty-two witnesses were heard, including a number of experts on both sides.

Three points are advanced for reversal: first, the court erred in admitting over objection the testimony of the plaintiff's expert witness, Fanscher, allegedly an expert on the operation of amusement parks, who testified as to the profits which would have accrued from the park operation during the war years; second, error in the admission of the testimony of the plaintiff's witness, Stubee, on cost of repairs and in the court's charge with respect to damages; and, third, the

admission over objection of resolutions of the Bridgeton City Council containing recitals of alleged illegal acts of the defendant. This is cited as error despite the fact the court in its charge instructed the jury to disregard this evidence.

In an effort to prove loss of profit, the plaintiff produced a witness, Fred W. Fanscher, who testified as an expert in the operating of amusement parks. His testimony was objected to because of lack of qualifications and special knowledge and also upon the ground that the hypothetical question asked of him was based on a false premise, was not the proper subject of expert testimony and encroached upon the functions of the trial jury.

His qualifications were attacked primarily because he never owned or operated *in toto* an amusement park. While this is true, the evidence shows him to have been connected with the amusement park business for twenty-five years in various capacities: operating concessions, acting as consultant, and selling amusement devices to park owners and concessionaires. His operations covered two hundred parks yearly from Maine to Georgia and he was a former director and official of the only amusement trade organization in the United States and Canada.

The qualifications of experts are left to the discretion of the trial court and the decision is conclusive unless clearly shown to be erroneous as a matter of law. *New Jersey Zinc & Iron Co. v. Lehigh Zinc & Iron Co.*, 95 N. J. L. 189 (*E. & A.* 1896); *Ross v. Commissioners of Palisades Interstate Park*, 90 N. J. L. 461 (*Sup. Ct.* 1917); *Essex County Park Commission v. Brokaw*, 107 N. J. L. 110 (*E. & A.* 1930); *Cowdrick v. Pennsylvania R. R. Co.*, 132 N. J. L. 131 (*E. & A.* 1944); *Bosze v. Metropolitan Life Ins. Co.*, 1 N. J. 5 (1948). There was sufficient evidence to justify the ruling made below as to the witness' qualifications and we are not warranted on the record established in coming to an opposite determination.

Was the expert testimony concerning profits admissible or did it encroach upon the function of the trial jury? The true test of admissibility of such testimony is not whether

the subject matter is common or uncommon or whether many persons or few have knowledge of the matter; but it is whether the witnesses offered as experts have peculiar knowledge or experience not common to the world which renders their opinions founded on such knowledge or experience any aid to the court or jury in determining the questions at issue. *Rogers, Expert Testimony* (3rd Ed., 1941), § 31. *Taylor v. Town of Monroe*, 43 *Conn.* 36 (1875).

In *Cook v. State*, 24 *N. J. L.* 843 (*E. & A.* 1855), the court, stressing the assistance received from such testimony and emphasizing the function reposed solely in the jury, said:

"The line between questions of science or professional skill, to which an expert may legally testify, and questions of mere judgment, which the jury alone are to answer upon the *facts* proved, is not always susceptible of being clearly defined. * * * The opinion of witnesses, possessing peculiar skill, is admissible whenever the subject matter of inquiry is such, that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it, without such assistance."

While in *Crosby v. Wells*, 73 *N. J. L.* 790 (*E. & A.* 1907), the court, after referring to many authorities on the subject, commented:

"It is not now needful for us to adopt a perfect and all-embracing definition of the phrase 'opinion evidence.' * * * For present purposes, opinion evidence is that which is given by a person of ordinary capacity, who has, by opportunity for practice, acquired a special knowledge which is outside of the limits of common observation, and which may be of value in elucidating a matter under consideration."

This too seems to be the rule adopted in the federal courts as was held in *U. S. Smelting Co. v. Parry*, 166 *F.* 407 (1909), cited in *Langenfelder v. Thompson*, 179 *Md.* 502, 20 *A.* 2d 491 (1941), where the court observed:

"The most important qualification of the general rule before stated is that which permits a witness possessed of special training, experience, or observation, in respect of the matter under investigation, to testify to his opinion *when it will tend to aid the jury* in reaching a correct conclusion." (Italics added.)

■ Weighing the admissibility of the proffered expert testimony in question upon the scales provided by these standards, we think the witness' knowledge of amusement parks acquired over a period of years sufficient as "an aid to the court or jury" to assist them in determining the profits lost and was therefore admissible.

Merit, however, is manifest in the contention that the calculation of damages relating to anticipated profits was without evidential support and based solely on conjecture and surmise. The expert testified in his opinion during the war years there would have been an increase in patronage at the amusement park in question to the extent of fifty or seventy-five per cent, concluding quite obviously that this would mean an increase in profits. The witness was then asked:

"Mr. Fanscher, assuming that Mr. Rempfer, from the operation of Tumbling Dam Park, starting in August, 1933, which I conceive to be less than a full season, and the seasons of '34, '35, '36, '37, '38, '39 and '40 made a profit of $27,000, can you tell us in your opinion what would have been a reasonable profit, bearing in mind this changed condition in parks, for a similar period, including the years '41, '42, '43, '44, '45, '46 and '47?"

There was a proper objection, which was overruled, and this answer permitted:

"* * * in line with the other parks my estimate would be from fifty to fifty-five thousand dollars for the war years. * * * The very minimum, I would say, seventy-five hundred dollars a year. * * *"

The first inquiry, of course, is the origin of and why the figure of $27,000 was used in this hypothesis. Oral argument indicated it was a mistake and what really had been intended was the figure of $29,000, arrived at by calculating the capital investments made out of profits by the plaintiff in his amusement park, including the cost of boat houses, wharves, amusements, bath houses, lights, equipment and buildings, but excluding the original investment representing the purchase price. There was no evidence of the plaintiff's operat-

ing profit before the years in issue. He had no books or records showing income or expenditures and did not even file an income tax return prior to 1942.

■■ Evidence as to the loss of profits in tort actions is probably never exact but there must always be a reasonably fair basis for calculating the loss sustained by the wrong committed. The possession and production of permanent . books and records to establish past profits is not a prerequisite for recovery but the inquiry is whether under the testimony such profits are capable of being estimated with a reasonable degree of certainty. *Rabinowilz v. Hawthorne*, 89 *N. J. L.* 308 (*E. & A.* 1916).

Here Rempfer testified the profits were all plowed back into the park and expended for capital improvements of the buildings and equipment. He gave round figures for each item which concededly were not based upon independent recollection, records or data but were merely his guess or estimate, which he thought synonymous, of the amount spent. His testimony as to the cost of capital improvements differed considerably from the statements made by him in his pretrial depositions and the opportunity of proving the value or cost of capital improvements by expert testimony was not embraced. So Fanscher was permitted to give testimony upon the probable earnings of the park during the years in dispute based upon one single item or fact, to wit, a profit of $27,000. He was without knowledge of the number of employees engaged, the wages paid, the increase or decrease in salaries over a like period, the yearly profits or losses, if any, in the previous period, the method of operation, the competition encountered or reasonably expected, the facilities enjoyed and the many other factors that would necessarily have to be taken into consideration in estimating the potential profits for the years in question.

■■ Profits must be proved; they cannot be estimated by a jury without data to justify their findings. *Barlow v. Erie R. R. Co.*, 73 *N. J. L.* 12 (*Sup. Ct.* 1905). Similarly, an expert cannot give an opinion without considering all the data, facts and circumstances pertinent to the inquiry being

made. As was said in *Baltimore Bell R. Co. v. Sattler,* 100 *Md.* 306, 59 *A.* 654 (1905):

"* * * to allow the expert to give such testimony not only puts him in the place of the jury, but permits him to indulge in mere speculation."

The jury cannot indulge in mere speculation and surmise and this is equally true of an expert witness. The opinion of the plaintiff's expert here is so completely lacking in proper foundation as to be worthless and therefore not admissible.

In 2 *Wigmore, Evidence* (*3rd Ed.* 1940), § 672, the author says:

"The reasoning may be explained in the following propositions: 1. Testimony in the shape of inferences or conclusions *rests always on certain premises of fact.* * * * 2. *These premises,* a consideration of which is essential to the formation of the conclusion or opinion, *must somehow be supplied to the jury by testimony.* * * * 3. If * * * a witness is put forward to testify to the conclusion, *the premises considered by him must be expressly stated, as the basis of his conclusion;* otherwise, since his conclusion rests for its validity upon a consideration of the premises, the tribunal, if those premises are not made to accompany the conclusion, might be accepting a conclusion for which the witness had considered premises found by the tribunal not to be true. 4. Hence, the *premises must be stated hypothetically in connnection with the conclusion.* * * *"

Or as was ruled by our own court in *Beam v. Kent,* 3 *N. J.* 210 (1949):

"The opinions and conclusions of experts must be based either upon facts within their own knowledge which they detail to the jury or upon hypothetical questions embracing facts supported by the evidence and relating to the particular matters upon which the expert opinion is sought, which facts, for the purpose of the opinion, are assumed to be true."

This testimony was the cornerstone upon which the jury was permitted to estimate the profits lost by the plaintiff. It was erroneously admitted, necessitating a reversal and a trial *de novo* limited as and for the reasons hereinafter stated.

The defendant next contends there was error in reference to the testimony of the plaintiff's witness, Stubee, and makes a three-pronged attack in reference thereto, charging the impropriety of the evidence, the court's charge in respect to damages and the refusal to charge as requested on the application of the rule of depreciation.

The plaintiff, in addition to anticipated profits already referred to, in his complaint claimed the pollution of Sunset Lake created a deposit on the bed of the lake "causing both temporary and permanent damage to the lands, premises and waters owned by plaintiff and the air in and around said lands, premises and waters." The proof submitted consisted of the results of an analysis of the soil on the bottom of the lake obtained by a method devised by the plaintiff's expert, Carlitz. He held himself out as a chemist and a bacteriologist and under his instructions a galvanized half-inch water pipe was driven into the bottom of Sunset Lake some distance from the shore line in the bathing area. It was thereafter removed and delivered to Carlitz, who subjected it to basteriological examination and concluded it indicated that the pollution of the lake increased with depth. He recommended that the bottom of the lake be dredged and the soil so removed replaced and covered with concrete.

His testimony is criticized and ridiculed as completely unsound from a scientific point of view but, despite this, the record shows no objection to its admission and, following its vigorous condemnation, the defendant says:

"It is recognized that the unsound basis of the expert's testimony, its confused nature and its rampant contradictions were factors to be considered by the jury."

There is therefore no issue in this respect for us to pass upon.

The witness, Stubee, described the survey which he made and the amount of excavation, fill and concrete capping necessary and then testified as to his computation of the materials required. When asked for his estimate of the total cost of the work, an objection was made by counsel for the defendant but, after the correction of a figure and when the question

was repeated as to the cost of the work, the record shows no objection to it. In fact, counsel by inference consented to its admission "subject to its being stricken later."

The motion to strike was based upon the ground that the proper method of determining permanent damages had not been established, relying upon *McGuire v. Grant,* 25 *N. J. L.* 356 (*Sup. Ct.* 1856), and *Freeman v. Sayre,* 48 *N. J. L.* 37 (*Sup. Ct.* 1886), to the effect that the true test of damages is the diminished value of the property injured.

██ ██ Whether an injury to real property is permanent or temporary in character, the pleadings permitting, is an issue of fact to be decided by the jury. Here both were alleged and, while the diminution in value is the proper measure of damages, the jury may "in determining that, consider the reasonable cost of repairs necessary by reason of the defendant's trespass or negligence, and which were approximately caused by it." *Newman v. Pasternack,* 103 *N. J. L.* 434 (*E. & A.* 1927).

This was also the rule in *Bates v. Warrick,* 77 *N. J. L.* 387 (*Sup. Ct.* 1909), in which the defendant insisted that the evidence of costs of repairs should not have been admitted because the true measure of damage was the depreciation in value resulting from the trespass, but the court held:

"* * * the probable cost of repairs required to restore the building to its former condition was a proper element to be considered in ascertaining the diminution in value of the realty."

In *Manda v. City of Orange,* 77 *N. J. L.* 285 (*Sup. Ct.* 1909), we have:

"Whether or not the diminution in value is in every case to be regarded as the measure of damages is a question which we need not now decide. * * * But even in jurisdictions where this rule prevails, as in New York, it is held that evidence of the cost of restoring land to its former condition is also admissible."

*Watson v. Town of New Milford,* 72 *Conn.* 561, 45 *A.* 167 (1900), is factually close to the situation in the case *sub judice.* There a stream had been polluted by domestic sewage leaving sludge and the plaintiff submitted proof of the cost

of removing the deposit. Holding the evidence admissible, the court said:

"Proof of what it would cost to clean up the premises by removing the offensive deposits was relevant to the question of damages."

In *Hartshorn v. Chaddock*, 135 *N. Y.* 116, 31 *N. E.* 997 (1892), the court, considering the same question, said:

"There were two methods of measuring the damages, depending upon circumstances, and all competent evidence offered should have been received by the referee, and hence it was not error to admit proof of the cost of restoring the soil to the condition it was in before the overflow. *Seely v. Alden, supra* [61 *Pa.* 302, 100 *Am. Dec.* 642]. But .there was no evidence offered by either party in regard to the effect of the injury upon the market value of the lot, and we cannot know from the record whether the diminution. in value was more or less than the cost of restoration. The evidence offered, being competent, furnished some proof as a basis for the award of damages. * * *"

This seems to be the prevailing rule established by many authorities in many jurisdictions, including our own.

We see no error in the court's charge or in its refusal to strike the testimony referred to. We reach a like conclusion in reference to its refusal to charge as requested by the defendants.

The last reason advanced by the defendants is that they were prejudiced by the admission over objection of resolutions of the Bridgeton City Council containing recitals of alleged illegal acts of the defendants. This they claim to be so even though the court in its charge specifically instructed the jury to disregard them.

These two resolutions were offered in evidence on April 12, 1949, over objection. On April 19th, seven days thereafter, the court informed counsel that this evidence would be stricken. We think they were wrongfully received in the first instance but an examination of the whole case does not make it appear there was error injuriously affecting the substantial rights of the defendants.

At the time the court corrected the situation on the 19th of April, no request was made that instructions be given immediately to the jury in this regard; no motion for a mistrial

was entered but testimony continued to be taken in the ordinary course of the trial until April 28th without complaint or objection. The court then charged:

"* * * I directed those resolutions should be stricken from the evidence. So you will eliminate them from your minds. Those two resolutions have no bearing in this case, and you will eliminate them entirely."

This is clear, forceful and unequivocal language and in our opinion was sufficient to offset and eradicate any effect that these resolutions might have had upon the minds of the jury at the time.

If inadmissible evidence has been received during a trial, the error of its admission may be cured by its subsequent withdrawal before the trial closes or by an instruction to disregard it without more, such latter instruction at times being equivalent to striking out the improper evidence. *Boniewsky v. Polish Home of Lodi*, 103 *N. J. L.* 323 (*E. & A.* 1927). We here conceive no error justifying a reversal under these circumstances.

██ ██ This was a long, protracted, difficult case involving sixty-two witnesses and much expert testimony and consuming four weeks in point of time. The only error requiring a reversal was in reference to testimony related solely to the question or amount of damages. Liability was fixed and established by the jury. When a new trial is necessary it may, in the discretion of the court, be limited to the question with respect to which the verdict is found to be wrong. If separable and if the error relates solely to the *quantum* of damages, it may be set aside as to damages only. *Paolercio v. Wright*, 2 *N. J.* 412 (1949). *Rule* 3:59–1. Here the error related solely to the damages involved and the new trial hereby ordered is therefore so limited.

The judgment below is reversed and a new trial ordered as to damages only.

*For reversal*—Chief Justice VANDERBILT, and Justices CASE, WACHENFELD, BURLING and ACKERSON—5.

*For affirmance*—Justices HEHER and OLIPHANT—2.