248 N.J. Super. 409 (1991)
591 A.2d 652
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
MELVINA MCCLAIN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 19, 1991.
Decided May 23, 1991.
*412 Before Judges O'BRIEN, SCALERA and KEEFE.
Stephen W. Kirsch, Assistant Deputy Public Defender, argued the cause for the appellant (Wilfredo Caraballo, Public Defender of New Jersey, attorney).
Catherine A. Foddai, Deputy Attorney General, argued the cause for the respondent (Robert J. Del Tufo, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by KEEFE, J.A.D.
Defendant Melvina McClain was convicted of the purposeful and knowing murder of Louis Glenn (count one); possession of a firearm, a handgun, with purpose to use it unlawfully (count two); and unlawful possession of a weapon (count three). Count two was merged into count one for the purpose of sentencing and defendant was sentenced to a 30 year prison term without parole on that count. On count three, she was sentenced to a concurrent five year term. A VCCB penalty was also imposed.
On appeal, defendant contends that: 1) the trial judge erred in that he failed to instruct the jury that the State had the *413 burden of proving beyond a reasonable doubt that defendant did not kill in the heat of passion or while acting under reasonable provocation; 2) the judge erred when he reinstructed the jury, in response to their request, on aggravated assault and reasonable provocation; 3) the trial judge erred when he instructed the jury concerning the inference that could be drawn where the homicide is committed with a deadly weapon; 4) the trial judge's instruction on diminished capacity was incomplete; 5) the trial judge erred when his instructions to the jury concerning their function reduced the State's burden of proof and; 6) the trial judge erred in instructing the jury on the count charging her with possession of a firearm with purpose to use it unlawfully. We find no error in any of the issues presented by defendant and affirm.
Defendant, a parking violations officer with the Trenton Police Department, had a long-term intimate relationship with the victim, Louis Glenn, also a Trenton police officer. The relationship began in 1977 and ended on October 11, 1986 in a bar when defendant shot Glenn three times at close range with a handgun she had concealed in a sock.
The relationship was not always a happy one. The discord was resulted from Glenn's tendency to have affairs with other women. In fact, Glenn had apparently fathered a child with another woman. His conduct would cause breaks in the relationship for a period of time, the last disruption being a five or six week period in the spring of 1986. However, defendant would eventually resume the relationship on Glenn's representation that the other women did not matter to him.
According to defendant, Glenn had physically assaulted her twice during the relationship, once in 1977 and the second time three or four years prior to his death. Defendant also understood Glenn to imply, on several occasions, that he would harm her if she ever elected to terminate the relationship.
However, during the week preceding Glenn's death, he did not physically assault defendant nor did he verbally threaten *414 her. In fact, defendant perceived Glenn's conduct as being detached. He broke two dinner dates which he had made with her that week and ignored her when she entered the bar earlier in the afternoon and wanted to talk to him concerning his conduct during the week and his activities with other women.
Defendant testified that she left the bar after being ignored by defendant and went to her home which was only a short distance away. Shortly thereafter she telephoned Glenn at the bar and spoke with him for about ten minutes. During the conversation Glenn told her he was his own man and would do whatever he wanted to do and he never intended to marry her or anyone. He hung up on her and defendant became hysterical, crying uncontrollably, but claims not to have become angry.
Witnesses testified that defendant re-entered the bar and as Glenn got up from a bar stool and called out her name, defendant shot him three times with a handgun hidden in a sock. After shooting Glenn, defendant was heard to say she shot him because she was "tired of him cheating on me" or "because I was tired of him f____ing over me." A similar statement was given to the police once she was placed in custody.
For her part, defendant's memory of the shooting was "cloudy." She only vaguely remembered taking her gun from the closet and walking down the street toward the bar.
Psychiatric testimony was presented at trial by both the defense and the prosecution. Dr. Marcia Kleinman, who has a doctorate degree in clinical psychology and specializes in treating battered women, testified for the defense. She concluded that, as a result of a long history of physical and psychological abuse at the hands of different men beginning from the age of 13, defendant did not act with the mental state necessary to constitute murder and was unaware of what she was doing at the time. Kleinman characterized defendant's behavior in each of her relationships with men as "passive and dependent, ... [v]ery consistent with someone who's been a battered woman." *415 She defined the battered woman syndrome as "a woman 18 years of age or older, who's been in a relationship with a man, in an intimate relationship in which there has been either repeated physical or psychological abuse. It doesn't have to be both. Where there has been control over her behavior, actions." The battered woman syndrome can exist whether or not the parties are married.
Although Glenn had not physically assaulted defendant for several years before the incident, Kleinman was of the view that there were a series of psychological humiliations. There does not have to be ongoing physical abuse in order to constitute a battered woman. In Kleinman's view, it was this ongoing psychological abuse that triggered defendant's mental "breakdown" and led to the killing of Glenn. In her opinion Glenn's killing was committed in a "disassociated," almost "robotic" state during which defendant was "behaving in ways and doing things, but was not really aware in a sense, conscious of what she was doing." Defendant's disassociated state was reflected in the "glazed" look in defendant's eyes portrayed in a photograph taken shortly after the shooting. Her sorrow was inconsistent with "a woman who would have intended to or who wanted to cause harm." Thus, according to Kleinman, "[t]hese results suggest that it is extremely unlikely that Miss McClain premeditated a plan to kill Mr. Glenn."
In rebuttal, the State presented Dr. Daniel Greenfield, a board certified psychiatrist, who testified that, despite her dependent personality disorder and having been subjected to moderate to severe levels of stress, defendant was aware of her conduct at the relevant periods of time. He rejected any notion that defendant suffered from a disassociative disorder during the killing, because she described her actions and did not seem to be in a "fugue state" when she killed or shortly thereafter. It was also his opinion that her behavior, such as putting a gun in a sock to conceal it, would not occur in a disassociated state. He also noted that her statement that the victim was "f____ing around on me" demonstrated a motive. He did, however, agree *416 with Dr. Kleinman, albeit "guardedly," that defendant fit the criteria for battered woman's syndrome.

I
Defendant maintains that the trial judge failed to charge the jury that the State had the burden of proving beyond a reasonable doubt that she did not act in the heat of passion. Both the trial judge's initial charge to the jury and his recharge when the jury asked him to explain "reasonable provocation" were based upon the model jury charge that was disapproved in State v. Grunow, 102 N.J. 133, 145, 506 A.2d 708 (1986). In that case, the Supreme Court said:
[T]his form of charge, by not expressly referring to the burden of proof, may inadequately convey to the jury that the prosecution must prove beyond a reasonable doubt every fact necessary to constitute the crime of murder, including the absence of reasonable provocation. The model jury charge should be revised to conform more closely to Powell and the dictates of Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).
Id. at fn. 5. Thus, if passion/provocation manslaughter was an appropriate alternative verdict for the jury to consider in this case, the error was prejudicial. Id. However, the State contends the error was harmless because the evidence did not support such a charge.[1] We agree with the State's position on this point and conclude that the instruction, though erroneous, resulted in harmless error.
It is improper for a trial judge to instruct the jury on passion/provocation manslaughter when there is no rational basis in the record to support such a conviction. State v. Crisantos, (Arriagas), 102 N.J. 265, 276, 508 A.2d 167 (1986). There are four elements of passion/provocation manslaughter:
the provocation must be adequate; the defendant must not have had time to cool off between the provocation and the slaying; the provocation must have actually impassioned the defendant; and the defendant must not have actually cooled off before the slaying. (citation omitted). The first two criteria are *417 objective, the other two subjective. If a slaying does not include all of those elements, the offense of passion/provocation manslaughter cannot be demonstrated.
State v. Mauricio, 117 N.J. 402, 411, 568 A.2d 879 (1990). We focus here on the first element and conclude from the record that the evidence, viewed in a light most favorable to defendant, was insufficient to support an objective determination that there was adequate provocation.
Passion/provocation manslaughter is "[a] homicide which would otherwise be murder under section 2C:11-3 ... [if it were not] committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4b(2). Thus, passion/provocation manslaughter can be used only to reduce an otherwise purposeful or knowing murder from a first degree offense to a second degree offense. State v. Grunow, supra.
Because the test for the existence of adequate provocation is objective, "the fact that the defendant possesses some peculiar mental or physical characteristic, not possessed by the ordinary person, which caused him, in the particular case, to lose his self-control" is not relevant. 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.10, at 262 (1986). This general rule was specifically endorsed by the Legislature when it adopted N.J.S.A. 2C:11-4b(2) and rejected the Law Revision Commission's recommendation that criminal homicide becomes manslaughter when it occurs "under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse." Final Report, Vol. I, at 51, § 2C:11-4(a)(2); State v. Grunow, supra, 102 N.J. at 140, 506 A.2d 708. Thus, the contention that defendant was provoked by the victim's conduct solely from her viewpoint as a battered woman, as opposed to the objective view of a reasonable person under the same circumstances, has been specifically rejected in this State. Id.; State v. Mauricio, supra, 117 N.J. at 411, 568 A.2d 879.
The rejection by the Legislature of "the subjective view of mitigation" in passion/provocation manslaughter holds true also for the "justification" aspect of self defense. State v. *418 Grunow, supra, 102 N.J. at 141, 506 A.2d 708. The similarity in the treatment of the two concepts becomes important when considering the relevancy and sufficiency of "battered woman syndrome" evidence in the context of the a passion/provocation manslaughter charge. At oral argument, defendant, relying upon State v. Kelly, 97 N.J. 178, 478 A.2d 364 (1984), argued that defendant's evidence proving the existence of the battered woman's syndrome was relevant, not only to prove defendant's diminished mental capacity, but also to establish the objective criteria of adequate provocation. We disagree with defendant's interpretation of Kelly. In Kelly, the Supreme Court found such testimony to be admissible solely to prove defendant's honest and reasonable belief that she was in imminent danger of death or serious injury. Kelly, supra, 97 N.J. at 202-204, 478 A.2d 364. The Supreme Court pointed out that such evidence was admissible only to prove the subjective aspect of the defense of justification or self defense, not the objective aspect of the test.
We do not mean that the expert's testimony could be used to show that it was understandable that a battered woman might believe that her life was in danger when indeed it was not and when a reasonable person would not have so believed, for admission for that purpose would clearly violate the rules set forth in State v. Bess, supra, 53 N.J. 10 [247 A.2d 669]. Expert testimony in that direction would be relevant solely to the honesty of defendant's belief, not its objective reasonableness.
Id. at 204, 478 A.2d 364.
In our view, the use of battered woman syndrome testimony relative to the subjective aspects of the defense of justification, as in Kelly, is akin to using such testimony to prove the subjective aspects of passion/provocation manslaughter, i.e. whether defendant was actually impassioned by the provocation and whether she actually cooled off before the slaying. On the other hand, it is irrelevant on the question of whether the victim's conduct was adequately provocative because that inquiry requires application of the objective "reasonable person" test.
*419 Defendant's reliance upon State v. Kelly, supra, and State v. Guido, 40 N.J. 191, 211, 191 A.2d 45 (1963) for the proposition that "evidence of prior physical abuse of defendant by the decedent" may be sufficient to establish a finding of provocation is taken out of the context of the facts in which those cases were decided. In Guido, there was evidence that the victim actually injured defendant on several occassions, that decedent was a man who constantly threatened defendant physically in order to get his way, and that such a physical threat actually occurred within a short time preceding the victim's death. Guido, supra, 40 N.J. at 195-196, 191 A.2d 45. In Kelly, there was evidence, although disputed, that defendant's husband was assaulting her and that she stabbed him in self defense, fearing that he would kill her if she did not act. Kelly, supra, 97 N.J. at 187-188, 478 A.2d 364. In both cases the physical threats or use of force were closely related in time to defendant's action. There is nothing either in Guido or Kelly to suggest that the "purely objective" test for provocation has been abandoned.
Thus, the inquiry remains whether the provocation alleged was "sufficient to arouse the passions of an ordinary [person] beyond the power of his [or her] control." State v. King, 37 N.J. 285, 301-302, 181 A.2d 158 (1962). "The provocation must be severe enough that the `intentional homicide may be as much attributable to the extraordinary nature of the situation as to the moral depravity of the actor.'" (citation omitted), State v. Mauricio, supra, 117 N.J. at 412, 568 A.2d 879. It is well established that words alone never constitute sufficient provocation. State v. Crisantos, supra, 102 N.J. at 274, 508 A.2d 167. In addition, evidence that defendant was sexually rejected, teased or repulsed by a paramour is insufficient to constitute adequate provocation. State v. Hollander, 201 N.J. Super. 453, 474, 493 A.2d 563 (App.Div. 1985), certif. denied 101 N.J. 335, 501 A.2d 983 (1985).
When the evidence is viewed objectively in light of these principles, there is an absence of either physical abuse or threat *420 of physical harm within any reasonable period of time prior to the murder. In fact, defendant denied that she maintained her relationship with Glenn out of fear. Indeed, Glenn's conduct during the preceding week evidenced an effort to distance himself from defendant. Moreover, the phone call defendant received during the week of the murder concerning Glenn's fathering another child was not the first time she suspected him of such behavior. She admitted she had seen a picture of a baby at Glenn's house earlier and confronted him about it. Although defendant claimed the phone call made her "anxious" and that she wanted to talk to Glenn further about it, she neglected to even tell Dr. Kleinman or Dr. Greenfield about this event. In addition, although defendant told Dr. Kleinman that Glenn verbally harassed her during their conversation earlier in the bar, defendant denied at trial that such was the case. In fact, defendant said the victim ignored her and that is why she left the bar. This is simply not the type of evidence that has ever been recognized as being sufficiently provocative "to arouse the passions of any ordinary [person] beyond the power of his [or her] control." State v. King, supra, 37 N.J. at 301-302, 181 A.2d 158.
Further, Dr. Kleinman's explanation of defendant's conduct does not support defendant's claim that the shooting was objectively provoked. Dr. Kleinman merely stated that the series of verbal humiliations which occurred during the week of the murder were extremely telling of defendant's agitated, confused, upset and anxious mental state at the time of the killing. However, Dr. Kleinman admitted there were no recent acts of physical abuse or threatened physical abuse. She perceived the only "threat" as being "the threat of the relationship being put off which was making Ms. McClain very, very anxious and distraught."
Dr. Kleinman admitted she was attempting to understand and explain defendant's actions from defendant's perceptions, "her experience of the behavior." It didn't matter to Dr. Kleinman whether defendant's perceptions were accurate or *421 inaccurate, because battered "women do kill at a time when they are at the moment not under any imminent threat, but there has been an underlying threat throughout the relationship...." The thrust of Dr. Kleinman's testimony was not on the objective criteria of provocation but, rather, how a battered women would subjectively perceive those events and how that perception would affect the woman's ability to act purposely or knowingly. Thus, Dr. Kleinman's opinion and analysis focused on defendant's diminished mental capacity by reason of her status as a battered woman, thereby negating the possibility that defendant acted purposely or knowingly. Obviously if, as Dr. Kleinman opined, defendant did not act purposely or knowingly in killing Glenn, she could not be convicted of passion/provocation manslaughter.

II
The jury requested a definition of aggravated manslaughter and reasonable provocation. The judge repeated his charge on each of those subjects. His failure to repeat the entire charge in order to restate the context in which the terms were used is not error. His earlier charge clearly described the inter-relationship of the charges and the sequential nature of the jury's work.
The trial judge's response to the jury's questions, which was agreed upon after consultation with counsel, fully complied with the jury's request and did not interfere in any way with defendant's right to a fair trial. Defendant's argument rests on sheer speculation. The failure of the jury to ask for further clarification or indicate confusion demonstrates that the response was satisfactory.

III
It has long been held that "the use of a deadly weapon raises an inference that there was an intent to kill, ... [however,] a jury may reject such an inference." State v. Thomas, *422 76 N.J. 344, 357, 387 A.2d 1187 (1978). We are satisfied that the instruction given the jury was such as to convey to the jury that the inference was a permissible one and not violative of constitutional principles. State v. Ingram, 98 N.J. 489, 488 A.2d 545 (1985). The judge said:
In your deliberations, you may consider the weapon used and the manner and circumstances of the killing, and if you are satisfied beyond a reasonable doubt that the defendant shot and killed the decedent with a gun, you may draw an inference from the weapon used, that is the gun, and from the manner and circumstances of the killing, as to the defendant's purpose or knowledge.
We note that defense counsel did not object to the instructions on this point and, therefore, assume that defense counsel understood the instructions in the total context of the charge as giving the jury the freedom to act or not act on the inference.

IV
As to the trial judge's instructions concerning diminished capacity, defendant asserts that the jury would have been more likely to view the evidence as providing an all or nothing escape from liability for defendant, having never been told that the mental defect could render her liable for a lesser crime if not completely exonerating all liability. Thus, defendant claims the judge erroneously presented the jury with an all or nothing choice. We disagree.
The judge stated that if the jury found the State had not proven beyond a reasonable doubt that defendant had the mental states of purposely or knowingly, or recklessly, or any other mental state which was an element of any of the offenses that he charged, then the jury had to acquit on those given charges. The charge addressed the mental state of defendant as an element of any of the offenses charged in the case; therefore, the jury knew that it could find defendant guilty of a lesser offense based upon mental disease or defect. The judge made it clear that the mental disease or defect applied to all of the charges. He instructed the jury on all lesser homicides, and the jury was not precluded from considering those offenses regardless of the claim of mental disease or defect.

*423 V
Defendant claims that at the conclusion of his charge, the trial judge lowered the State's burden of proof by stating, "You are [the] judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case." Defendant contends that this error was egregious because, although the judge spoke about reasonable doubt earlier in the charge, he never reinforced that concept after the alleged erroneous charge on the jury's duty to determine the truth. Defendant claims there was the possibility that the jury having been so instructed, could only presume they had the duty of determining the truth in resolving all factual conflicts even if those conflicts could not be resolved beyond a reasonable doubt.
We find no merit to this contention. The instruction given the jury must be read in context and as a whole. State v. Wilbely, 63 N.J. 420, 422, 307 A.2d 608 (1973). At the outset of the charge, the judge stated:
This defendant, as are all defendants in criminal cases, is assumed to be innocent until proven guilty beyond a reasonable doubt. That presumption continues throughout the whole trial of the case and even during your deliberations, unless and until you have determined that the State has proven her guilt beyond a reasonable doubt. The burden of proof is on the State and it never shifts. It remains on the State throughout the whole trial of the case. No burden with respect to proof is imposed on the defendant. She is not obliged to prove her innocence. Unless the State has proved the crime charged and each of its elements beyond a reasonable doubt, the defendant is entitled to an acquittal.
We are satisfied that when the portion of the charge objected to is read in context with the portion just quoted, a jury could not come to the conclusion defendant now espouses.

VI
Defendant next challenges the trial judge's charge to the jury on the count of possession of a weapon for an unlawful purpose. However, we have reviewed the judge's instructions in this respect and find that when read as a whole, the judge *424 properly instructed the jury on the essential elements of the crime. Id.
Affirmed.
NOTES
[1] The State objected to the passion/provocation manslaughter charge at the time of trial. Its objection was overruled and the charge was given.