696 A.2d 780

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. ERICKA ANNETTE HINES, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued May 14, 1997—Decided July 24, 1997.

Before Judges SKILLMAN, A.A. RODRIGUEZ and CUFF.

*Mark H. Friedman*, Assistant Deputy Public Defender, argued the cause for appellant (*Susan L. Reisner*, Public Defender, attorney; *Mr. Friedman*, of counsel and on the brief).

*Gerard C. Sims, Jr.*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General, attorney; *Mr. Sims*, of counsel and on the brief).

*Crummy, Del Deo, Dolan, Griffinger & Vecchione*, attorneys for amicus curiae New Jersey Coalition for Battered Women (*Lawrence S. Lustberg* and *James E. Ryan*, on the brief).

The opinion of the court was delivered by

SKILLMAN, J.A.D.

Defendant was indicted for robbery, in violation of *N.J.S.A.* 2C:15-1, felony murder, in violation of *N.J.S.A.* 2C:11-3a(3), and purposeful or knowing murder, in violation of *N.J.S.A.* 2C:11-3a(1), (2). A jury acquitted defendant of these charges but found her guilty of theft, in violation of *N.J.S.A.* 2C:20-3, which was submitted to the jury as a lesser included offense of robbery, and aggravated manslaughter, in violation of *N.J.S.A.* 2C:11-4, which was submitted to the jury as a lesser included offense of purposeful or knowing murder. The court sentenced defendant to a thirty year term of imprisonment, with fifteen years of parole ineligibility, for aggravated manslaughter, and a concurrent six month term of imprisonment for theft. In addition, defendant pled guilty pursuant to a plea bargain to a charge under a separate indictment of possession of cocaine, in violation of *N.J.S.A.* 2C:35-10a(1), for which she was sentenced to a four year term of imprisonment to be served concurrently with her sentence for aggravated manslaughter.

On appeal defendant makes the following arguments:

I. THE TRIAL JUDGE DEPRIVED DEFENDANT OF HER CONSTITUTIONAL RIGHT TO PRESENT EVIDENCE AND OF DUE PROCESS OF LAW BY BARRING EXPERT TESTIMONY THAT WHEN SHE KILLED ARTHUR HINES SHE WAS SUFFERING FROM POST-TRAUMATIC STRESS DISORDER (PTSD) RESULTING FROM BEING SEXUALLY ABUSED AS A CHILD.

II. DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE AND UNDULY PUNITIVE.

We conclude that the trial court committed reversible error by refusing to allow defendant to present expert testimony relating to post traumatic stress disorder (PTSD). Consequently, defendant's convictions must be reversed and she must be granted a new trial. This conclusion makes it unnecessary for us to consider defendant's arguments relating to her sentence.

Because defendant argues that expert testimony relating to PTSD would have supported her claim that she acted in self-defense or, in the alternative, was guilty of passion/provocation

manslaughter rather than murder or aggravated manslaughter, it is appropriate to set forth defendant's version of the alleged offense. On November 4, 1991, the date of the offense, defendant was twenty years old and the victim, Arthur Hines, who was defendant's father, was seventy-three years old. Defendant testified that beginning when she was nine and continuing until she was thirteen, the victim had committed repeated sexual assaults upon her. These assaults originally took the form of touching her breasts and genital area and escalated to sexual intercourse when she was around eleven. According to defendant, the victim used physical force to commit these sexual assaults, which occurred two or three times a month for several years, and did not stop until the victim moved out of the house when defendant was thirteen. The victim continued to make sexual advances towards her over the next seven years, but she was able to rebuff them. Despite the sexual abuse which the victim had perpetrated upon her, defendant maintained a relationship with the victim, which included periodic visits to his apartment.

On the day of the killing, defendant went to the victim's apartment to get a ride to a local welfare office. The victim was fully dressed when she walked into his apartment, and she sat down on the edge of his bed to watch television. However, according to defendant, the victim went into the bathroom shortly thereafter, emerged wearing only boxer shorts and a shirt, sat down on the bed, and put his arm around her shoulder. Defendant testified that this conduct made her think about the first time he had sexually assaulted her. Defendant stood up and told the victim to stop, but he again grabbed her. Defendant made eye contact with the victim at this point, and according to defendant, "I just knew what he wanted." Defendant pushed the victim away with both hands, and he "stumbled backwards," but did not fall. The victim immediately came back towards her and grabbed her around the waist. Defendant tried to break loose, but could not. When defendant saw a hammer on top of a tool box next to where the victim was holding her, she picked it up and struck him. The victim stumbled backwards toward the outside door of the apart-

ment but did not fall down. According to defendant, the victim pushed himself up and said, "you little son of a bitch, I'll kill you," and started walking back towards her. Defendant then hit the victim's head with the hammer numerous additional times, killing him. Defendant testified that she was afraid during this confrontation not only that the victim would sexually assault her but also that he would seriously injure or kill her. Defendant also testified that she did not feel she could escape "in safety" without using physical force.

According to the defendant, she immediately left the victim's apartment and went to her mother's house without taking anything. However, she returned to the apartment later, at which time she put the victim's pants partially back on his legs, took $40 which had fallen out of one of the pockets, and used the money to purchase cocaine.

On cross-examination, the prosecutor confronted defendant with a statement she gave to the police shortly after the killing. Defendant stated at that time that her attack upon the victim was unprovoked, and that immediately afterwards she had taken $40 out of his pocket which she used to purchase cocaine. Defendant did not mention in that statement that the victim had sexually assaulted her. In fact, defendant admitted that the first time she ever mentioned the victim's alleged sexual assault to anyone was in her fourth interview with Dr. Hall, the psychologist retained to assist her defense. Defendant also admitted that she had smoked some crack cocaine before going to the victim's apartment.

To support her defense, defendant proposed to present the testimony of Dr. Hall, a psychologist who specializes in treating child sexual abuse, to testify about Child Sexual Abuse Accommodation Syndrome (CSAAS), to explain defendant's failure to tell anyone about the sexual abuse which the victim had allegedly perpetrated upon her, and PTSD, to explain why defendant believed that the victim intended to rape her and that she needed to use force to avoid his assault. Dr. Hall submitted a pretrial report which stated in part:

On the day of the murder, Ms. Hines was in a position of dependence and vulnerability with respect to her father. She was in his apartment, she needed a ride from him, she had recently smoked crack cocaine (perhaps to help her cope with going to her father's apartment), she did not have her children present with her (her usual way of avoiding sexual contact) and she was sitting on a bed watching television. This latter fact is important because these circumstances are similar to those Ms. Hines described the first time Arthur Hines raped her (and perhaps similar to other times he raped her as well). In much the same way as battered women murder their abuser in situations where their lives have been repeatedly threatened and where they might assume the threat to occur again . . ., Ms. Hines may have struck her father because she had every reason to believe that he was about to rape her again. The heightened physiological reactivity that is characteristic of PTSD and that Ms. Hines had identified as causing her to strike others (e.g., her mother or her lover when either approached her from behind) may have resulted in her striking her father when she believed herself to be in physical danger with no other means of escape. At the time of the murder, Ms. Hines was reexperiencing the sexual abuse as she had experienced it as a child, with no way of escaping. Women with a history of sexual abuse are often unable to escape or avoid sexual assault as adults. If Ms. Hines did not have a history of chronic sexual abuse, and if she was not impaired by her drug use, she may have been able to get up and leave when her father accosted her. Unfortunately, this was not the case.

At a preliminary hearing relating to the admissibility of her proposed testimony, Dr. Hall described the symptoms of PTSD:

[PTSD] is a psychological psychiatric diagnosis that is different from a [CSAAS], and to qualify for a diagnosis of [PTSD], you have to have had suffered a stressor that is outside the range of usual human experiences, and that would be distressing to almost anyone, and that as a result of that traumatic event, you would, you would manifest the following syndromes: One major category would be that the traumatic events would be reexperienced by the individual in a number of ways after the traumatic event has ceased, and that could be found in having just repeated recurrent distressing memories or recollections, intrusive thoughts about the event, this could be manifested by having recurrent and distressing dreams of the event or nightmares, that a person might all of the sudden feel or act as if the traumatic event were reoccurring to them, that might be manifested by having anxiety attacks or panic attacks or all of the sudden feeling that having a feeling that something terrible was going to happen again, or they were going to be assaulted, that there would be intense psychological distress manifested when the individual is exposed to events that symbolized or resembled an aspect of the traumatic event.

Dr. Hall indicated that "a person suffering from [PTSD] will often feel as though the traumatic event were reoccurring and respond in reaction to that." Consequently, "[i]f the individual is suffering from [PTSD], and they are confronted with the situation that is

similar to the original trauma, it is very likely that the individual will experience a sense of hyper-arousal, reliving of the original trauma, and will act in whatever manner they can in order to protect themselves." The "perception of the current reality" of a person suffering from PTSD "can be distorted by the feelings that they're having based on their past trauma, so the feelings are of tremendous danger, tremendous sense of helplessness, that may be more applicable to a past traumatic event than the current one." Dr. Hall further testified that the PTSD from which defendant was suffering when she killed her father was similar to "Battered Woman's Syndrome" in that she acted in a way which was consistent with the belief "that there was no way of escaping, that there was going to take tremendous force in order to stop someone from hurting her."

After the preliminary hearing regarding the admissibility of Dr. Hall's proposed testimony, the trial court issued a written memorandum decision, which concluded that all of her testimony relating to PTSD was inadmissible. The court reasoned that:

> The jury is able to assess without the benefit of expert testimony, how a reasonable person previously the victim of child sexual abuse would react if confronted with a subsequent sexual abuse situation. Therefore, there is no reason to place before this jury Dr. Hall's conclusion that because the defendant suffered from [PTSD], that she would have reasonably acted to defend herself. That is a matter for the jury's determination.

The court also stated that Dr. Hall's opinions "constitute conjecture and speculation and have not been formed within the bounds of reasonable psychological probabilities." However, the court further concluded that "Dr. Hall, because she is an expert in [CSAAS], will be permitted to inform the jury of the characteristics of that Syndrome so as to dispel any misconceptions which the jury may have with respect to delayed disclosure of child sexual abuse," but that she would not be permitted to offer an opinion as to whether defendant's conduct was "consistent with the characteristics of [CSAAS]."

In response to defense counsel's inquiry as to whether Dr. Hall would be prohibited from giving any testimony at all regarding PTSD, the court stated:

> That's correct, the [PTSD] in essence, Dr. Hall's opinion, is that if someone suffered from [PTSD], which was, which is always brought on by a trauma, that if placed in a similar circumstance as to the original trauma, that person would be hyper-vigilant, would be aroused, and judgment may be impaired. We do not need a psychologist or psychiatrist to tell us that. If someone were to strike the Judge on the back of the left ear with a baseball bat, and a year later the Judge saw somebody approaching from behind with a baseball bat, I would not need a psychologist to tell me to be hyper-vigilant, that would be a normal human reaction, the Jury can well understand that.

Based on these rulings, Dr. Hall gave only brief testimony before the jury explaining CSAAS and then was excused.

Our review of the trial court's decision barring defendant from presenting Dr. Hall's proposed testimony regarding PTSD is governed by the principles set forth in *State v. Kelly*, 97 *N.J.* 178, 478 *A.*2d 364 (1984), in which the Court held that expert testimony regarding "battered woman's syndrome" was admissible to help establish a claim of self-defense in a homicide case. In *Kelly*, the Court indicated that there are "three basic requirements for the admission of expert testimony: (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony." *Id.* at 208, 478 *A.*2d 364.

The State does not dispute that the phenomenon of PTSD is generally accepted within the field of psychology and consequently has sufficient reliability to satisfy the second test of admissibility identified in *Kelly*.[1] The State also does not dispute

---

[1] We note that PTSD is recognized as a psychiatric disorder by the American Psychiatric Association, American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 424–29 (4th ed.1994) [hereinafter *Manual of Mental Disorders* ], and that courts in other jurisdictions have held that PTSD has sufficient scientific reliability to justify the admission of expert testimony about the condition in appropriate circumstances. *See, e.g., Hutton v. State*, 339 *Md.* 480, 663 *A.*2d 1289, 1295–97 (1995); *State v. Janes*, 121 *Wash.*2d 220, 850 *P.*2d 495, 502 (1993). However, we also note that the admissibility of scientific evidence may turn not only on its reliability but the purpose for which it is offered. *See State v. Cavallo*, 88 *N.J.* 508, 520, 443 *A.*2d 1020 (1982) ("Expert

that Dr. Hall has sufficient expertise regarding PTSD, particularly as it relates to victims of childhood sexual abuse, to satisfy the third test of admissibility identified in *Kelly*.[2] However, the trial court's rationale for excluding Dr. Hall's proposed testimony, and the sole ground relied upon by the State to sustain that ruling, is that defendant failed to satisfy the first test of admissibility set forth in *Kelly*—that "the intended testimony must concern a subject matter that is beyond the ken of the average juror." Therefore, it is necessary to consider the scope of this test of admissibility of expert testimony, and whether Dr. Hall's proposed testimony satisfied the requirement.

In *State v. Berry,* 140 *N.J.* 280, 291, 658 *A.*2d 702 (1995), the Court, quoting *Rempfer v. Deerfield Packing Corp.,* 4 *N.J.* 135, 141–42, 72 *A.*2d 204 (1950), stated that "[t]he true test of admissibility of [expert] testimony is not whether the subject matter is common or uncommon or whether many persons or few have knowledge of that matter; but ... whether the witnesses offered as experts have peculiar knowledge or experience not common to the world which renders their opinions founded on such knowledge or experience any aid to the court or jury in determining the

---

evidence that poses too great a danger of prejudice in some situations, and for some purposes, may be admissible in other circumstances where it will be more helpful and less prejudicial"); *see also State v. J.Q.,* 130 *N.J.* 554, 580–81, 617 *A.*2d 1196 (1993). Because the State has not questioned the scientific reliability of PTSD evidence, we have no need to consider whether such evidence has sufficient scientific reliability to justify its admission in other contexts.

[2] The trial court concluded that "Dr. Hall possesses no qualifications as a criminologist and she is no better qualified than any lay person in the community to judge the reasonableness of the defendant's conduct." However, defendant did not offer Dr. Hall as an expert in criminology but rather as a clinical psychologist with special expertise in PTSD and treating victims of child sexual abuse. The State properly concedes the adequacy of Dr. Hall's credentials to testify as an expert regarding these subjects. We also note that Dr. Hall would not be allowed to express an opinion as to the honesty or reasonableness of defendant's alleged belief that she had to use lethal force to defend herself against the victim's advances. *State v. Kelly, supra,* 97 *N.J.* at 206–07, 478 *A.*2d 364.

questions at issue." Consequently, an "expert opinion is admissible if the general subject matter at issue, or its specific application, is one with which an average juror might not be sufficiently familiar, or if the trial court determines that the expert testimony would 'assist the jury in comprehending the evidence and determining issues of fact.'" *Id.* at 292–93, 658 *A.*2d 702 (quoting *State v. Odom,* 116 *N.J.* 65, 70, 560 *A.*2d 1198 (1989)).

PTSD "is an anxiety-related disorder which occurs in response to traumatic events outside the normal range of human experience." *State v. Janes, supra,* 850 *P.*2d at 501. Traumatic events typically associated with PTSD include sexual and physical assaults, military combat, torture, natural disasters and imprisonment. *Manual of Mental Disorders, supra,* at 424. However, a person who experiences such a traumatic event does not always develop PTSD. In fact, one recent study indicates that although 80% of women who reported rape experienced PTSD, only 25% of persons exposed to other potential PTSD inducing events developed the disorder. Karl Kirkland, *Post-traumatic Stress Disorder v. Pseudo Post-traumatic Stress Disorder,* 56 *Ala. Law.* 90, 92–93 (1995). The American Psychiatric Association has developed a detailed set of criteria for diagnosing PTSD.[3] When PTSD is

---

[3] A. The person has been exposed to a traumatic event in which both of the following were present:

 (1) the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others

 (2) the person's response involved intense fear, helplessness, or horror.

. . .

 B. The traumatic event is persistently reexperienced in one (or more) of the following ways:

 (1) recurrent and intrusive distressing recollections of the event, including images, thoughts, or perceptions. . . .

 (2) recurrent distressing dreams of the event. . . .

 (3) acting or feeling as if the traumatic event were recurring (includes a sense of reliving the experience, illusions, hallucinations, and dissociative flashback episodes, including those that occur on awakening or when intoxicated). . . .

experienced by children who have been subjected to sexual or other abuse, it is sometimes referred to as "battered child syndrome." *State v. Janes, supra,* 850 *P.*2d at 501 n. 5.

When a person develops PTSD "[t]he characteristic symptoms resulting from the exposure to extreme trauma include persistent reexperiencing of the traumatic event, persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness, and persistent symptoms of increased arousal." *Manual, supra* at 424. Two symptoms, hyper-vigilance and re-experiencing of prior trauma, are particularly relevant to claims of self-defense by a person afflicted with PTSD because these symptoms can affect a person's state of mind when confronted with a

---

(4) intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event

(5) physiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event

C. Persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (not present before the trauma), as indicated by three (or more) of the following:

(1) efforts to avoid thoughts, feelings, or conversations associated with the trauma

(2) efforts to avoid activities, places, or people that arouse recollections of the trauma

(3) inability to recall an important aspect of the trauma

(4) markedly diminished interest or participation in significant activities

(5) feeling of detachment or estrangement from others

(6) restricted range of affect (e.g., unable to have loving feelings)

(7) sense of a foreshortened future (e.g., does not expect to have a career, marriage, children, or a normal life span)

D. Persistent symptoms of increased arousal (not present before the trauma), as indicated by two (or more) of the following:

(1) difficulty falling or staying asleep

(2) irritability or outbursts of anger

(3) difficulty concentrating

(4) hypervigilance

(5) exaggerated startle response

E. Duration of the disturbance (symptoms in Criteria B, C, and D) is more than 1 month.

F. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

[*Manual of Mental Disorders, supra,* at 427–29].

situation similar to the initial traumatic event. *See* Paul Mones, *Parricide: Opening a Window Through the Defense of Teens Who Kill,* 7 *Stan. L. & Pol'y Rev.* 61, 63 (1995–96).

The State has not cited any decision which holds that evidence of PTSD should be excluded on the ground that the subject is within the understanding of the average juror and consequently the testimony of an expert would not be helpful to the jury. The cases brought to our attention by the parties and our own research indicate that although expert testimony regarding PTSD is sometimes excluded on other grounds, such as lack of materiality or unfair prejudice, *see, e.g., Hutton v. State, supra,* 339 *Md.* 480, 663 *A.*2d 1289, it is uniformly recognized that when such evidence satisfies other conditions of admissibility, it may be introduced to explain the nature of the disorder and its consequences. *See Shepard v. State,* 847 *P.*2d 75, 83 (Alaska.Ct.App.1993) (PTSD testimony "could unquestionably have assisted the jury in understanding and evaluating a significant aspect" of defendant's claim of self defense.); *State v. Vigil,* 110 *N.M.* 254, 794 *P.*2d 728, 732 (1990) ("Certainly, it cannot be assumed that conduct associated with [PTSD] is a subject of common experience or understanding"); *State v. Janes, supra,* 850 *P.*2d at 503 ("Expert testimony regarding the syndrome helps the jury to understand the reasonableness of the defendant's perceptions."); *cf. Cotton v. State,* 639 *So.*2d 577, 579–80 (Ala.Crim.App.1993) (assuming without discussion that expert testimony is required when a defendant relies upon PTSD in connection with a claim of self defense); *State v. Purcell,* 107 *Ohio App.*3d 501, 669 *N.E.*2d 60, 62–63 (1995) (same); *see also Hutton v. State, supra,* 663 *A.*2d at 1301–02.

The scholarly commentaries also conclude that expert testimony is helpful to the jury in understanding PTSD. John Nelson Scobey, *Self–Defense Parricide: Expert Psychiatric Testimony on the Battered Child Syndrome,* 13 *Hamline J. Pub.L. & Pol'y* 181, 182 (1992)("Expert psychiatric testimony on the syndrome would help the jury better understand the defendant's state of mind in the self-defense context, especially as to the requirements that the

defendant perceives a danger and endeavor to escape or avoid conflict."); Jamie Heather Sacks, Comment, *A New Age of Understanding: Allowing Self–Defense Claims for Battered Children Who Kill Their Abusers*, 10 *J. Contemp. Health L. & Pol'y* 349, 350 (1993)("[T]he average juror ... cannot understand the dynamics of the complex relationship between a batterer and a victim."); Michelle Ann Scott, Note, *Self–Defense and the Child Parricide Defendant: Should Courts Make a Distinction Between the Battered Woman and Battered Child*, 44 *Drake L.Rev.* 351, 375 (1996)("[F]or a jury to fairly evaluate a self-defense claim in the context of an abusive family, they must have access to expert testimony explaining the psychological changes resulting from such abuse.").

 Because defendant was acquitted of purposeful or knowing murder, we have no need to consider the relevance of PTSD to that charge. However, because self-defense is a complete defense not only to murder but also to manslaughter, *State v. Kelly, supra,* 97 *N.J.* at 203–04 n. 12, 478 *A.*2d 364, we must consider the impact of the trial court's exclusion of evidence of PTSD upon the jury's consideration of self-defense and passion/provocation manslaughter.

The use of force against another in self-defense is justifiable "when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." *N.J.S.A.* 2C:3–4(a). However, the use of "deadly force" is only justifiable when "the actor reasonably believes that such force is necessary to protect himself against death or serious bodily injury." *N.J.S.A.* 2C:3–4(b)(2). To justify the use of force in self-defense, the actor must have an actual "honest" belief in the necessity of using force and that belief must be "reasonable" in light of the circumstances existing at the time of the homicide. *State v. Kelly, supra,* 97 *N.J.* at 198–200, 478 *A.*2d 364.

In *Kelly,* the Court concluded that expert testimony regarding battered woman's syndrome was "directly relevant" to the jury's

evaluation of the credibility of the defendant's alleged belief at the time of the crime "and was thus material to establish the honesty of her stated belief that she was in imminent danger of death." *Id.* at 201, 478 *A.*2d 364. The Court also concluded that "expert testimony [would be] relevant to the reasonableness of defendant's belief that she was in imminent danger of death or serious injury." *Id.* at 204, 478 *A.*2d 364. The Court indicated that "[d]epending on its content, the expert's testimony might also enable the jury to find that the battered wife, because of the prior beatings, numerous beatings, as often as once a week, for seven years from the day they were married to the day he died, is particularly able to predict accurately the likely extent of violence in any attack on her." *Id.* at 207, 478 *A.*2d 364. Therefore, the Court held that defendant's expert "could state ... that defendant had the battered-woman's syndrome, and could explain that syndrome in detail, relating its characteristics to ... the honesty and reasonableness of defendant's belief." *Ibid.*

Similarly, we conclude that Dr. Hall's proposed testimony regarding PTSD would have been directly relevant to the issues of the honesty and reasonableness of defendant's purported belief that she had to resort to deadly force in order to repel the victim's assault. *See State v. Janes, supra,* 850 *P.*2d at 502 ("[T]he same reasons that render[ ] evidence of the battered woman syndrome helpful to the jury in a self-defense case ... apply with equal force to ... battered child evidence."). Dr. Hall's expert opinion that defendant was suffering from PTSD at the time of the killing, and that "if [an] individual ... suffering from [PTSD is] confronted with [a] situation that is similar to the original trauma, it is very likely that the individual will experience a sense of hyper-arousal, reliving of the original trauma, and will act in whatever manner they can in order to protect themselves" provided strong support for defendant's claim that she had an "honest" belief that she had to use deadly force to protect herself. Dr. Hall's assessment of defendant's psychological condition also may have lent credibility to defendant's assertion that the victim sexually abused her as a child, which was relevant to the reasonableness of her belief that

he intended to sexually assault her again. *Cf. State v. Kelly,* *supra,* 97 *N.J.* at 205, 478 *A.2d* 364 (noting that the victim's "regular pattern of serious physical abuse" of the defendant was relevant to the reasonableness of defendant's fear that the victim might kill her).

For similar reasons, Dr. Hall's testimony was relevant to defendant's contention that even if the killing was not an act of self-defense, it constituted passion/provocation manslaughter rather than purposeful or knowing murder or reckless manslaughter. "Passion/provocation manslaughter has four elements: the provocation must be adequate; the defendant must not have had time to cool off between the provocation and the slaying; the provocation must have actually impassioned the defendant; and the defendant must not have actually cooled off before the slaying." *State v. Mauricio,* 117 *N.J.* 402, 411, 568 *A.2d* 879 (1990). Dr. Hall's testimony regarding PTSD was directly relevant to the question whether defendant's provocation "actually impassioned the defendant." *Cf. State v. Pitts,* 116 *N.J.* 580, 611–14, 562 *A.2d* 1320 (1989) (expert testimony that defendant experienced a "rage reaction" together with other evidence that defendant was induced to kill by reasonable provocation was sufficient to require submission to jury of charge of passion/provocation manslaughter). And because this testimony could aid the jury in assessing the credibility of defendant's allegation that the victim sexually abused her as a child and hence the reasonableness of her belief that he intended to rape her, it was also relevant to the question whether his provocation was "adequate." *See State v. Vigilante,* 257 *N.J.Super.* 296, 301–06, 608 *A.2d* 425 (App.Div.1992); *but see State v. McClain,* 248 *N.J.Super.* 409, 417–19, 591 *A.2d* 652 (App.Div.), *certif. denied,* 126 *N.J.* 341, 598 *A.2d* 897 (1991).

We emphasize that this is not a case in which evidence of PTSD was the only evidence defendant relied upon to establish self-defense or passion/provocation manslaughter. As the trial court correctly recognized, even if all evidence relating to PTSD were excluded, defendant's account of the victim's alleged assault upon

her was sufficient to require submission to the jury of the issue of self-defense and the lesser included offense of passion/provocation manslaughter. However, Dr. Hall's proposed testimony would have lent additional credibility to defendant's allegations regarding the victim's past sexual abuse and would have been probative of the honesty and reasonableness of her belief that she had to resort to deadly force to prevent him from raping her again. Therefore, we are unable to conclude that the erroneous exclusion of evidence of PTSD was harmless.

Accordingly, defendant's conviction is reversed and the case is remanded for a new trial.